IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | | |
|---|---|---|
| ANGELA STUDDARD, individually and as lawful wife, next of kin, administrator ad litem, and personal representative for EDMOND STUDDARD, Deceased, and Estate of Edmond Studdard, | ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 2:17-cv-02517 |
| SHELBY COUNTY, TENNESSEE; SHERIFF WILLIAM OLDHAM, in his capacity as Sheriff of Shelby County, Tennessee; SHELBY COUNTY SHERIFF'S OFFICE; ERIN J. SHEPHERD, individually and as employee or agent of Shelby County, Tennessee; and TERRY I. REED, individually and as employee or agent of Shelby County, Tennessee, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## REED AND SHEPHERD'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants Erin Shepherd and Terry Reed ("Defendants") hereby move the Court to enter summary judgment in their favor.  In support of their Motion, Defendants state as follows:

### INTRODUCTION

On July 7, 2016, Sheriff's Deputies Erin Shepherd and Terry Reed came face to face with a man covered in blood, holding what appeared to be a knife, waving the knife and refusing to drop it, and yelling at them to shoot him.  That man, Edmond Studdard, had cut his own wrists minutes earlier.  The deputies pleaded with him to drop the knife; instead he began moving

toward them, the knife raised in the air or to his own neck.  When he was within an unsafe distance and closing, Deputies Shepherd and Reed shot a total of five times, striking Studdard twice and ceasing fire as soon as he fell.  They immediately rushed to him to secure the knife and to render medical aid.  Mr. Studdard did not die on the scene, likely due to their quick actions in rendering aid.  Tragically, however, he died two months later at the hospital.  Nonetheless, the facts in the record make it clear that Studdard and Reed acted reasonably.

Summary Judgment should be granted in Reed and Shepherd's favor as they are entitled to qualified immunity on two grounds.  First, they did not violate Mr. Studdard's Fourth Amendment rights because they acted reasonably in light of rapidly evolving, life-threatening circumstances.  Second, even if their actions constituted a Fourth Amendment violation (they did not), Shepherd and Reed did not violate a clearly established right in light of Sixth Circuit and Supreme Court precedent.

## RELEVANT FACTS AND PROCEDURAL HISTORY

A 911 call was made on July 7, 2016 from A & H Ironworks, a business located in Shelby County on Big Orange Road at around 1:00 p.m.. (Lane Dep. 65; Shepherd Dep. 197).[1] Shelby County Motorcycle Deputy Kyle Lane responded to the call, believing at the time he was responding to a hit-and-run incident. Lane knew only that "a male white . . . had a wreck and then he left the scene." (Lane Dep. 59).  But in fact, before Lane's arrival, Edmond Studdard had gotten into an altercation with his father at A & H Iron Works.  As a result, Studdard crashed his vehicle into his father's parked vehicle and, at some point, slit his wrists with a blade before leaving the building on foot, traveling north on Big Orange Road.

---

[1] The Deposition Transcripts and Exhibits cited in this Memorandum are taken from Defendants' Joint Statement of Undisputed Material Facts.  They are labeled by letter based on the order in which they appear in the Statement, unless they are sub-exhibits (e.g., exhibits contained within depositions or other exhibits).

Deputy Lane pulled into a parking lot and a group of people ran out to him yelling, "There he is.  Go get him.  He slit his wrists." (Lane Dep. 68).  Lane caught up to Studdard on his motorcycle, trying to talk to him. (Lane Dep. 74).  Once Lane got close enough, Studdard turned around, looked at Lane, and as Lane put it, "shows me a knife." (Lane Dep. 74). "When [Studdard] reached around or turned around to show me his knife, he wanted me to see that knife.  And I interpreted that as a threat that if I get close to [him] . . . he's going to use it." (Lane Dep. 87). Once Lane saw the knife and Studdard's bloody wrists, he "backed up and started calling all the information in[ ]" on the radio. (Lane Dep. 82). The blade appeared to be "2 to 5 inches" and the weapon, altogether, appeared to be "6 to 8" inches long. (Lane Dep. 79).

Studdard continued walking (and at times running) northbound on Big Orange Road, (Lane Dep. 69; Shepherd Dep. 100, 104), and Lane continued to follow, approaching the T-section of Big Orange Road and Macon Road. (Lane Dep. 96).  As Lane followed Studdard, there was a tall wooden fence to Studdard's right, on the east side of the road. (Lane Dep. 100). The fence was over four feet tall, running north to south.  (Lane Dep. 101, 176, Deposition Exhibit 8).

Sheriff's Deputies Erin Shepherd, Samuel Pair, and Terry Reed—all members of the Patrol Crime Response Unit ("PCRU")—responded to Lane's call for assistance.[2] (Pair Dep. 106).  The deputies wore plainclothes under black vests with the yellow lettering "sheriff" on the front and back in bold print. (Pair Dep. 84-85; Reed Dep. 52, 173).  All deputies that day carried Sig Sauer .40 caliber service handguns. (Reed Dep. 53).  Pair was in an unmarked truck and Shepherd was his passenger. (Pair Dep. 94).  Reed drove a Ford Fusion car. (Reed Dep. 64).

---

[2] Deputy Inbrahim Abdullah also asserts that he arrived near the scene, but stayed a good distance away.  The other deputies testified that they did not see him in the immediate vicinity of the shooting.  In any event, it is not contested that Abdullah did not actually see Studdard when the shots were fired. (Abdullah Dep. 83, 128).

Reed testified the call to assist Lane "started off as a hit-and-run call that came out. And then it turned into an armed party." (Reed Dep. 113). Radio traffic reflected that an "individual that was walking had a knife or an edged weapon in his hand, he was walking, and the other officer on a motor bike was behind him." (Abdullah Dep. 48). While it is unclear what radio traffic information each deputy heard, they all knew that Lane was dealing with an armed subject. "Deputy Lane had already put over the radio that he has a knife in his hand. You know he's cut his wrists . . . ." "He obviously, at some point, had a blade because he slit his wrists." (Pair Dep. 161; *see generally* Reed Dep. 113).

The area Studdard was walking through was not isolated from the public. Big Orange Road is an industrial complex with various businesses throughout it. (Lane Dep. 69). These included A&H Iron Works, Conway Heating and Air, a golf driving range, and the Memphis Cheer Elite All-Stars cheerleading training camp. (Shepherd Dep. 92; Lane Dep. 69, 72, 76, 96; Reed Dep. 178).

When the deputies arrived, Studdard was still walking. (Reed Dep. 169). Reed saw "Lane following a male white that appeared to have a knife in his hand." (Reed Dep. 131). Pair and Shepherd arrived driving northbound on Big Orange Road, (Abdullah Dep. 78), with Reed right behind them. The two vehicles pulled up "basically simultaneously." (Reed Dep. 172). Pair (with Shepherd a passenger) pulled around in front of Studdard "to keep him from running to Macon, in case he [took] off running." (Pair Dep. 124). Shepherd told Pair as they were pulling up to "pull in front [north] of him so we can try to stop his forward movement." (Shepherd Dep. 215). The officers parked their vehicles and got out "in the middle, toward the opposite side of the street." (Abdullah Dep. 80). The officers essentially boxed Studdard in with the fence and their vehicles. (Reed Dep. 185). The three deputies—Pair, Shepherd, and Reed—got out into the

southbound lane, opposite Deputy Lane and Studdard. (Abdullah Dep. 80-82, 87). Pair came around the back of his truck and started approaching Studdard. (Pair Dep. 126). When Shepherd got out, she walked farther down the street. (Shepherd Dep. 122). As Pair, Reed, and Shepherd arrived, Lane threw his bike down, took off his helmet, grabbed his weapon, and pointed it at Studdard. (Lane Dep. 111). They were all "moving in from where [they] had started, but Lane stopped where he was." (Shepherd Dep. 134).

Shepherd was in the southbound lane "towards the middle of the street[,]" about 20 or 25 feet from Studdard; Studdard was in the grassy area and "started waving what appeared to be a bladed weapon around." (Shepherd Dep. 121-23,126, 133). Studdard turned to face the officers. (Lane Dep. 102). In that same time period, he also "backed up [and] had his back to the fence." (Lane Dep. 107). But he "was closer to the street, the curb than he was to the fence." (Lane Dep. 110). He was "on the edge of the street . . . ." (Lane Dep. 111).

When the deputies came face to face with Studdard, he had blood all over him. (Pair Dep. 105). Pair testified Studdard's face, head, and body were "covered in blood. He looked like a zombie." (Pair Dep. 131, 151). Shepherd testified that "[h]e was covered in blood and appeared to have a weapon in his hand." (Shepherd Dep. 108). At this point, Shepherd did not know whether Studdard had harmed anyone besides himself. (Shepherd Dep. 109). "We knew he was bleeding, or had blood on him, and had a weapon." (Shepherd Dep. 110).

All indications were that the weapon Studdard was holding was a knife with a blade.[3] Pair, a former construction worker, called it a "utility folding knife." (Pair Dep. 153, 157). During his deposition, Pair testified that "two feet away, I still can't tell if there's a knife or blade

---

[3] It now appears Studdard may have removed or dropped the razor blade that was in the knife sometime between cutting his wrist and the deputies' arrival. Regardless, there is no dispute that the object Studdard was holding looked like a knife and that it was reasonable to believe Studdard possessed a bladed weapon capable of causing serious bodily injury or death. (*See* Defendants' Expert Report at 7, 9, Ex. C; Plaintiff's Expert Report at 11, Ex. D).

in there." (Pair Dep. 158, Deposition Exhibit 7).  Reed saw what "appeared to be a knife with a pointed tip . . . ." (Reed Dep. 212).  Shepherd testified that the object was "shiny" and "appeared to be some kind of folding knife that was open. There was so much blood it was hard to tell exactly color or size." (Shepherd Dep. 141).

The deputies all had their service pistols drawn and ordered Studdard to drop the knife. (Lane Dep. 111, 113, 115; Pair Dep. 137; Shepherd Dep. 150).  Everyone continued to say "Put the knife down." (Lane Dep. 115).  Shepherd specifically said "Stop it's okay.  Don't do it. Let's not do this.  Put the knife down." (Shepherd Declaration with attached BPSI Statement, Ex. F). One of the officers yelled "If you do not put the knife down, we are going to shoot you." (Lane Dep. 115, 178).  In response, Studdard said "That's what I want." (Lane Dep. 115).

As everyone continued to yell, Studdard was moving and waving the knife constantly. "[H]e's obviously not stationary.  So he's moving back and forth, and he's swinging his arms, and his legs are moving.  I mean, his whole body is moving." (Pair Dep. 133-34).  At some point he pointed the knife at the deputies.  (Pair Dep. 134, 155; Shepherd Dep. 146, Reed Dep. 191). At other times he had the knife to his own neck.  (Lane Dep. 116).[4]  Even still, Studdard was "moving towards [them] at all times, almost." (Pair Dep. 136).  "[H]e started to panic.  Like he started – looked like he was starting to pace, look around, see what his next option was going to be." (Lane Dep. 107).  Lane is not sure if he saw Studdard walking or swaying, but "[h]e was moving." (Lane Dep. 108).[5]  Reed says Studdard was "frantic" and had a knife "in his hands,

---

[4] It is unclear from the testimony when Studdard had the knife to his neck, (s*ee, e.g.*, Pair Dep. 165), so for purposes of summary judgment Defendants assume he had it to his neck when the shots were fired as that seems to be the light most favorable to the Plaintiff.

[5] When asked about his BPSI statement, Lane stated that he did not see Mr. Studdard walk toward anyone.  (Lane Dep. 186-89).  However, his answer should be read in context with the BPSI statement he was being asked about.  In that statement, Lane said "I don't know if he was walking . . . I know his upper shoulders were moving . . . ." (Lane Declaration with attached BPSI Statement at 3).  When later asked whether he knew if Studdard was walking, he answered "I know his shoulders were moving but I was looking to the upper part of his body I didn't I didn't." (Lane Declaration with attached BPSI Statement at 4).  As he further clarified in his deposition, "the situation was starting

waving in the air." (Reed Dep. 184).   "He's moving constantly. It's fast. You know, he's moving fast.  You know, we told him to drop the knife.  God, I know I yelled it I can't tell you how many times; it was just over and over and over." (Pair Dep. 148).   "No response from him except, shoot me, kill me, shoot me, kill me, and then screaming." (Pair Dep. 148).  Studdard was "moving forward, backwards, side to side, all inside this box.  He's swinging arms, moving legs, head bobbing, covered in blood, you know, from head to toe it seemed like." (Pair Dep. 150).

As the deputies continued to order him to put the knife down, Studdard continued to yell that he wanted them to shoot him. Pair testified "I approach the dude, and tell him to drop the knife, drop the knife.  You know, he's moving all around, flailing, screaming, saying – you know, at some point he was saying, kill me, shoot me, kill me, shoot me, whatever." (Pair Dep. 133).  Reed testified that Studdard "yelled 'Shoot me. Shoot me.' I don't remember how many times he said it . . . ." (Reed Dep. 190).

At some point, Studdard began moving toward Deputy Lane. (Shepherd Dep. 135). Studdard then turned and began walking back toward Reed and Shepherd. (Shepherd Dep. 150). As he approached them, Pair was preparing to fire and was "pulling back on the trigger." (Pair Dep. 263).  Before Pair could pull his trigger, Reed and Shepherd fired.  Reed testified, "When he came at me with the knife, yeah, that's when I decided to fire my pistol." (Reed Dep. 206). "I saw the blade and I saw him coming toward me." (Reed Dep. 219).  Shepherd testified, "We let him get about seven to [ten] feet before we opened fire." (Shepherd Dep. 150).  Pair did not fire because, as he testified, "as soon as I heard them shoot, I let go" of the trigger. (Pair Dep. 264). He explained that "his reaction time was a little bit slower than theirs." (Pair Dep. 266).  Deputy Lane testified that Studdard was in the grassy area by the road, almost in it, or 3 to 5 feet away

to become heightened, and he was moving.  I can't – I don't remember if he was walking, or if he was swaying.  I just – he was moving.  That's all I can say." (Lane Dep. 261).

from it. (Lane Dep. 136-37). The whole encounter "happened fast." (Pair Dep. 166). Shepherd estimates that the incident happened "in 30 seconds." (Shepherd Dep. 206).

Studdard did not go down with the first shot. (Shepherd Dep. 160). Reed fired first; then Shepherd fired. The deputies ceased fire when Studdard fell to the ground. (Lane Dep. 237; Reed Dep. 218).  Reed testified that he "shot until the threat was over." (Reed Dep. 217). "As soon as Mr. Studdard went to the ground, we stopped firing and holstered our weapons." (Shepherd Dep. 162).  It is unclear how exactly Studdard fell on the ground, or in what position he ended up. (*See, e.g.*, Pair Dep. 169; Lane Dep. 136; Reed Dep. 242).  But there is no genuine dispute of material fact that Studdard was in the grassy area when he fell. (Reed Dep. 236). There is also no genuine dispute that Studdard was closer to the street than to the fence when he fell. (Lane Dep. 136-37).

As soon as Studdard went down, Shepherd ran up to him and reached down to touch him; Reed stopped her and kicked the blade out of his hand first. (Shepherd Dep. 188; Reed Dep. 208).  They then started giving Studdard medical aid.  (Pair Dep. 173).  "I saw the blade; kicked it.  And that's when we tried to – that's when we tried to rescue him." (Reed Dep. 242). Shepherd was "talking to the suspect trying to get him to stay positive." (Shepherd Dep. 189). Lane testified "I don't remember if we moved him or what, but we were trying to administer aid." (Lane Dep. 136).

Lane called for an ambulance immediately and Shepherd used a tampon to plug one of the wounds. (Lane Dep. 138-39; Pair Dep. 175).  Pair ran to his truck and got a t-shirt and a towel to stop the bleeding on Studdard's wrists. (Pair Dep. 174-75).  They also put pressure on the wounds to try to stop the bleeding until the ambulance arrived. (Lane Dep. 139; Pair Dep. 175). The ambulance took Studdard to the hospital while the deputies remained on the scene.

Various SCSO and Tennessee Bureau of Investigation personnel arrived on the scene to secure it.  Tragically, Mr. Studdard died on September 4, 2016. (*See* Amended Complaint, ECF 33, ¶ 27).

**ARGUMENT**

**Standard of Review**

Rule 56 of the Federal Rules of Civil Procedure provides that a court will grant summary judgment if the evidence offered demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a). A party in opposition to a motion for summary judgment "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

**A.      Qualified Immunity**

Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Wilson v. Layne*, 526 U.S. 603, 609 (1999) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). This immunity "gives government officials breathing room to make reasonable but mistaken judgments" and protects "all but the plainly incompetent or those who knowingly violate the law."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).  The plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity.  *Blake v. Wright*, 179 F.3d 1003, 1007 (6th Cir. 1999).[6] When the question is unclear as to whether an officer's use of force was reasonable or excessive, "the proper course is to grant summary judgment to the officers,

---

[6]  A § 1983 plaintiff must show that the defendant acted "knowingly or intentionally to violate his or her constitutional rights, such that mere negligence or recklessness is insufficient." *Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999) (citation omitted).

even if the court would hold the officers' conduct unconstitutional in hindsight." *Rudlaff v. Gillispie*, 791 F.3d 638, 644 (6th Cir. 2015) (citing *al-Kidd*, 563 U.S. at 131); *see Saucier v. Katz,* 533 U.S. 194, 206 (2001) ("Qualified immunity operates . . . to protect officers from the sometimes 'hazy border between excessive and acceptable force.' ").

In evaluating a claim of qualified immunity, courts in the Sixth Circuit consider (1) whether a constitutional violation occurred, (2) whether the right violated was clearly established, and (3) whether "the plaintiff has alleged sufficient facts, and supported the allegations by sufficient evidence, to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights."[7] *Majors v. Clark*, No. 04-2711-M1/V, 2006 WL 2032374, at *5 (W.D. Tenn. July 17, 2006) (quoting *Scicluna v. Wells*, 186 F.3d 685, 691 (6th Cir. 1999)); *see also Saucier*, 533 U.S. at 202.

## 1.   Whether an Excessive Force Violation Occurred.

Excessive force claims are analyzed under an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 397 (1989).  Courts analyze an officer's decision to use force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  Police officers face "tense, uncertain, and rapidly evolving" situations that require "split-second judgments."  *Id.* at 397. In determining qualified immunity in an excessive force case, a court considers "only the facts that were knowable to the defendant officers."  *White v. Pauly*, 137 S. Ct. 548, 550 (2017). The Fourth Amendment standard is reasonableness, "and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives

---

[7] As to the third prong, the Sixth Circuit explained in *Robertson v. Lucas*, 753 F.3d 606 (6th Cir. 2014): "We have, from time to time, elaborated a third step in the qualified immunity analysis: whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable in light of the clearly established constitutional rights.  This requirement is implicit in the two-step approach. Regardless of how the test is articulated, a defendant will only be held liable if his or her actions were objectively unreasonable in view of clearly established law."  *Id.* at 615 n.4 (internal citations and quotation marks omitted).

of others. This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes." *City & County of San Francisco, Calif. v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (internal citations and quotation marks omitted).   The Fourth Amendment requires officers to act reasonably based on the information they have; "it does not require them to perceive a situation accurately." *Thomas v. City of Columbus, Ohio*, 854 F.3d 361, 365 (6th Cir. 2017).

Under *Graham*, courts pay "careful attention to the facts and circumstances of [the case at issue], including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight[.]" *Graham*, 490 U.S. at 396.  Although the *Graham* factors guide the reasonableness inquiry, "the ultimate question" is "whether the totality of the circumstances justifies a particular sort of seizure." *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir. 2006) (internal quotation removed); *see Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005) ("[T]he most important single element of the three specified [*Graham*] factors [is]: whether the suspect poses an immediate threat to the safety of the officers or others.") (internal quotations and citation omitted).

The Fourth Amendment does not require that officers take the best approach, only a reasonable approach.  Officers do not have to be "omniscien[t], and absolute certainty of harm need not precede [an officer's] act of self-protection." *Wilkinson v. Torres*, 610 F.3d 546, 551 (9th Cir. 2010) (citation and internal question mark omitted).  And the "availability of a less-intrusive alternative will not render conduct unreasonable." *Id.* (citation omitted); *see Roell v. Hamilton Cty., Ohio/Hamilton Cty. Bd. of Cty. Commissioners*, 870 F.3d 471, 486 (6th Cir. 2017), *reh'g denied* (Sept. 21, 2017) ("Dr. Lyman's expert testimony, which essentially opines on

the best approach that the deputies could have taken in ideal circumstances, similarly does not establish that the deputies violated Roell's clearly established rights.").

In the Sixth Circuit, courts use what is known as the "segmenting approach" to analyze an officer's reasonableness "under the circumstances he faced at the time he decided to use force." *Thomas*, 854 F.3d at 365.  Under this approach, the court examines "whether the force used to effect that seizure was reasonable in the totality of the circumstances, ***not*** whether it was reasonable for the police to create the circumstances." *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007) (emphasis added).   Thus, even if an officer "approaches a scene recklessly, this will not necessarily render a later decision to protect himself unreasonable." *Thomas*, 854 F.3d at 365.  The *Thomas* Court explained the reasoning behind the segmenting approach in response to the plaintiff's argument that the defendant officer recklessly rushed too close and too quickly to the suspect's location, thereby forcing himself into a situation where he then had to defend himself with deadly force against the suspect:

> "[W]e cannot, as [Plaintiff] urges, find a constitutional violation based on how Officer Kaufman approached the crime scene. Arguably, Officer Kaufman's decisions to rush toward the apartment without backup violated Columbus Police Department procedures. Arguably, his violations increased the likelihood that Officer Kaufman might have to use force. ***But those decisions were not seizures.*** Their reasonableness is not at issue.

*Id.* at 365 (emphasis added); *see Sheehan*, 135 S. Ct. at 1777 ("Indeed, even if [the officers] misjudged the situation, Sheehan cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.") (citation and internal quotation marks omitted). Thus, courts consider only the moment of the alleged seizure and its surrounding circumstances, such as the threat at hand and the mental state of the suspect.

Officers may use deadly force to protect themselves even against suspects suffering from mental illness.  The day before the shooting at issue in this case, the Sixth Circuit recognized as

much in *Rucinski v. Cty. of Oakland*, 655 F. App'x 338 (6th Cir. 2016), where it affirmed a

finding of qualified immunity for officers who shot a knife-wielding mentally ill man during a

"welfare check" house call.  The plaintiff in *Rucinski* argued that the officers' actions were not

reasonable because they were conducting a welfare check on a mentally ill person, rather than

confronting a criminal.  But the *Rucinski* Court rejected this argument, observing:

> [Plaintiff] identifies no case law restricting an officer's ability to use deadly force
> when she has probable cause to believe that a mentally ill person poses an
> imminent threat of serious physical harm to her person; indeed, out of circuit case
> law weighs against this argument. *See, e.g.*, *Sanders v. City of Minneapolis*, 474
> F.3d 523, 527 (8th Cir. 2007) (quoting *Bates ex rel. Johns v. Chesterfield County,
> Va.*, 216 F.3d 367, 372 (4th Cir. 2000)) ("Knowledge of a person's disability
> simply cannot foreclose officers from protecting themselves . . . when faced with
> threatening conduct by the disabled individual.").

*Rucinski*, 655 F. App'x at 342.

The Sixth Circuit has also recognized that officers act reasonably in using deadly force

against individuals armed with knives, even if the perpetrator is not holding the knife in a

manner immediately threatening to the officers.  In *Chappell v. City of Cleveland*, 585 F.3d 901,

911-12 (6th Cir. 2009), the Sixth Circuit held that officers were entitled to qualified immunity

when they shot an approaching suspect with a knife, even though the suspect had the knife

pointed upward, rather than at them.  The Court explained:

> The district court mused, because the blade was pointed upward, that it was not in
> a position to immediately threaten them. Yet, whether the knife was held in a
> position more conducive to slashing than stabbing can hardly be deemed to
> undercut the formation of probable cause to believe that serious harm was
> imminently threatened. Further, the district court's musing about the significance
> of the knife's position in McCloud's hand, speculation at odds with both officers'
> on-the-scene perceptions . . . represents the impermissible substitution of the
> district judge's own personal notions—about what might have been, could have
> been, or should have been—in a "sanitized world of . . . imagination" quite unlike
> the dangerous and complex world where the detectives were required to make an
> instantaneous decision.

*Id.* at 911-12.

Further, deputies can reasonably use deadly force even when armed suspects are at a distance. An officer is not required "in a tense and dangerous situation to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007); *Clayton v. Columbia Cas. Co.*, No. CIV.A. 11-845, 2012 WL 5835676, at *17 (M.D. La. Nov. 16, 2012), *aff'd*, 547 F. App'x 645 (5th Cir. 2013) ("Faced with this immediate threat of serious harm, Deputy Johnson was not required to wait until Clayton was on top of him and attempting to physically overcome him before taking action to protect himself and others.").

Here, Deputies Shepherd and Reed were faced with a rapidly-evolving, unpredictable situation. Mr. Studdard was armed with a knife which he was waving around, pointing at them, placing up to his own neck, and with which he was constantly moving. The deputies could not reasonably anticipate what he might do next.[8] Even if he had kept the knife up to his own neck the entire time, the officers still reasonably perceived Studdard's actions, taken in their entirety, as dangerous to their safety. As both parties' experts agree, an individual with a knife up to his own neck still poses a deadly threat to others. (Defendants' Expert Report of Richard Lichten at 14-15, Ex. C; Plaintiff's Expert Report of Jeffrey Noble (excerpts) at 11, Ex. D). As Plaintiff's expert puts it, "a person could quickly move a knife from their throat to a stabbing position" and, thus, it was reasonable to believe Studdard posed an immediate threat of death or serious bodily injury to them. (Plaintiff's Expert Report at 11, Ex. D).

As to the distance between Studdard and the deputies, Studdard was close enough to constitute a serious threat in light of all the circumstances. Plaintiff's expert Noble opines that Studdard was 34 feet away when the officers fired their weapons. (Plaintiff's Expert Report at 17, Ex. D). Even under a generous interpretation of the facts in the light most favorable to the

---

[8] Under the segmenting analysis discussed above, the Court should consider the reasonableness of the deputies' decision to fire their weapons as Mr. Studdard approached them. Despite the allegations in Plaintiff's Complaint, when and how the deputies arrived on the scene is not relevant to the inquiry as those decisions were not seizures.

Plaintiff, this is inaccurate.  Under the Plaintiff's version of the facts, the officers were in the southbound lane, which separated them from the grassy area by 24 feet. (Plaintiff's Expert Report with attached Declaration of Jason Cunningham, Ex. D).  Deputy Lane testified that Studdard was by the road, almost in it, or 3 to 5 feet away from it. (Lane Dep. 136-37).  And Shepherd testified that she walked out toward the middle of the road. (Shepherd Dep. 121-23,126, 133).  Thus, at most, Studdard was 27 or 29 feet away and closing.  To reach the number 34, Plaintiff's expert relies on the affidavit of Paramedic Natalie Stewart stating that Studdard was over 10 feet from the road when she arrived on the scene. (*See* Plaintiff's Expert Report with attached Declaration of Natalie Stewart, Ex. D).  But the facts make clear that Stewart was not there when the shots were fired.  She does not testify that Studdard was standing in that location when he was shot, that the shots did not cause him to fall or stumble backward, or that the deputies did not move him while trying to secure him and when they rendered medical aid. Thus, the only material evidence comes from the measurements and the statements of Shepherd and Lane, which suggest at most 27 to 29 feet.

And even if Studdard had been 34 feet away, Defendants' expert Lichten opines that in the circumstances these officers faced, they would have acted reasonably in shooting from that distance.  As Mr. Lichten's report explains in more detail, a person armed with a knife can cover a distance of 34 feet in as little as 3 seconds.  (Defendants' Expert Report at 20, Ex. C). Studdard's words and actions made clear to a reasonable officer that he was going to continue to close in on one of them until they fired or he was close enough to touch them.  Rather than wait for that inevitable outcome, the deputies acted to defend themselves against a knife-wielding man who was covered in blood, refused to drop his knife, and who continued to move forward while screaming at them.

The deputies knew that they were faced with a dangerous situation. Studdard was armed and out in the open. There were no obstacles between him and them. He was not trapped in a building, but instead standing on a public street surrounded by public businesses in the middle of the day. And he only stopped traveling down the road when they forced him to stop by boxing him in against a segment of fence. As to Studdard's intentions, he refused to drop the weapon, despite the deputies telling him to do so with their firearms raised. Instead, in response he yelled at them to shoot him. All indications were that he had no intention of complying and, instead, was determined to force the deputies (with violence if necessary) to shoot him. Deputy Shepherd pleaded with Mr. Studdard to comply, saying "let's work this out." But he did not comply; he moved closer and closer to Shepherd and Reed, armed with a knife. At the moment the officers fired, they acted reasonably in light of the danger they faced.

**2.      Clearly Established Law**

To determine whether a right was clearly established at the time of an alleged violation, courts "look first to decisions of the Supreme Court, then to our own [Sixth Circuit] precedents, and then to decisions of other courts of appeal, and we ask whether these precedents placed the constitutional question beyond debate." *Hearring v. Sliwowski*, 712 F.3d 275, 280 (6th Cir. 2013) (citation omitted). A plaintiff cannot satisfy this burden by alleging a violation of "extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see Sheehan*, 135 S. Ct. at 1776 ("Qualified immunity is no immunity at all if 'clearly established' law can simply be defined as the right to be free from unreasonable searches and seizures."). Instead, case precedent must make the "contours of the right . . . sufficiently clear that a reasonable official would understand that ***what he is doing*** violates that right." *Anderson*, 483 U.S. at 640; *see White v. Pauly*, 137 S. Ct. 548, 552 (2017). Similarly, a plaintiff cannot rely simply on

unpublished opinions to show what has been clearly established within the Sixth Circuit. *Hall v. Shipley*, 932 F.2d 1147, 1152 (6th Cir. 1991) ("Unpublished opinions . . . are of little precedential value and thus of little, if any, import in determining whether the Sixth Circuit had 'clearly established' whether the possible destruction of drugs constitutes exigent circumstances in search warrant cases.").

The U.S. Supreme Court recently elaborated once again on the clearly-established-right element of the qualified immunity analysis in *Kisela v. Hughes*, 138 S. Ct. 1148 (2018) (per curiam).  Officers in *Kisela* shot a woman who was in her yard holding a kitchen knife and standing near her roommate. *Id.* at 1150-51. The facts in the record were unclear as to exactly what the woman was or was not doing at the time the shots were fired. *Compare id.* at 1150-51 *with id.* at 1155 ("The record, properly construed at this stage, shows that at the time of the shooting: Hughes stood stationary about six feet away from Chadwick, appeared 'composed and content,' and held a kitchen knife down at her side with the blade facing away from Chadwick.")(Sotomayor, J., dissenting). But the *Kisela* Court reversed the ruling of the Ninth Circuit on the basis that the officers faced a situation that had not been specifically addressed by the Supreme Court or the Ninth Circuit. The Court reiterated certain principles of qualified immunity:

> "[S]pecificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, [136 S.Ct. 305, 308] (2015) (per curiam) (internal quotation marks omitted). Use of excessive force is an area of the law "in which the result depends very much on the facts of each case," and thus police officers are entitled to qualified immunity unless existing precedent "squarely governs" the specific facts at issue.

*Kisela*, 138 S. Ct. at 1152-53.  The Court determined the officers could not have known that their specific actions that day were unconstitutional in light of case precedent.  *See also*

*Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) ("The dispositive question is 'whether the violative nature of ***particular*** conduct is clearly established.'") (emphasis in original) (citation omitted).

In this case, the Sixth Circuit has not spoken precisely to the situation Deputies Reed and Shepherd faced.  The situation here was highly particularized because Mr. Studdard indicated, by yelling "shoot me" and continuing to move, that he was going to get even closer to them than he already had. The officers reasonably inferred from this that, if they did not shoot, he would continue to close the distance until they shot, or until he physically reached them, at which point they reasonably assumed he might try to stab or slash them with the knife.

As to distance in particular, the Sixth Circuit has not established precedent that squarely governs the distance a knife-wielding suspect must breach in order to make a shooting *per se* reasonable or unreasonable.  And in *Bouggess v. Mattingly*, 482 F.3d 886 (6th Cir. 2007), the Sixth Circuit noted past cases in which findings of qualified immunity shared only two components: "the suspect in question was [ ] known by the police to possess a weapon and had indicated an intent to use that weapon against the police or others." *Id.* at 892 (citations omitted). A deputy relying on that precedent could reasonably believe that those two criteria were sufficient.

A review of subsequent published Sixth Circuit opinions does not add any more clarity to the precise distance (if one can even be said to exist) at which an officer's use of force against a knife-wielding suspect is unreasonable.  And in light of *Kisela*, it cannot be said that the precedent of outside circuits provides a "robust consensus of persuasive authority" on how the deputies should have reacted under these facts. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999). Thus, it cannot be said that firing their weapons at a knife-wielding Mr. Studdard—who was approaching them, had yelled he wanted to be shot, refused to drop the weapon, had already

18

shown that he had no hesitation cutting himself (or possibly others) with the knife, and who moved toward Deputy Lane and then toward Deputies Reed and Shepherd, at a distance of 29 feet (or even 34 feet) had previously been proscribed "beyond debate." *See Chavez v. Las Vegas Metro. Police Dep't*, No. 2:11-CV-01445-LRH, 2014 WL 374444, at *8 (D. Nev. Feb. 3, 2014) (finding officers entitled to qualified immunity on clearly-established prong even where they shot suspect at distances of 27 to 36 feet) *aff'd*, 648 F. App'x 657 (9th Cir. 2016); *see also Stevens-Rucker,* 2018 WL 3359554 (6th Cir. 2018) (finding officer entitled to qualified immunity who continued to shoot a knife-wielding suspect from 10-15 feet even after suspect was on the ground).

The decision in *Chappell* provides a somewhat closer set of facts that a reasonable officer could have relied on from the Sixth Circuit's published opinions. The knife-wielding suspect in *Chappell* approached the officers, knife pointed upward, and they fired.  *Chappell*, 585 F.3d. at 905. The suspect was only seven feet away, but there was a mattress between him and the officers, which obviously would slow the suspect's advance to some degree.  *Id.* at 911.  The Sixth Circuit reversed the district court and held that the officers were entitled to qualified immunity.  *Id.* at 916.  An officer, reacting to the circumstances Reed and Shepherd faced, could reasonable rely on *Chappell* for the proposition that shooting a knife-wielding suspect at a distance of 30 or even 35 feet is reasonable if, unlike the plaintiff in *Chappell*, there were no barriers like a mattress between the suspect and them.  If they could even be expected to make such a determination so quickly, they would be reasonable in calculating that a knife-wielding suicidal suspect could cover an open, unobstructed 35 feet as quickly (if not more quickly) as a person 7 feet away who would have to clear an obstacle.  And, in any event, such an assessment by Deputies Shepherd and Reed certainly was not so one-side to be considered "beyond debate."

### 3.      Reasonableness in Light of Clearly Established Law

Finally, as to the third prong of the Sixth Circuit's qualified immunity analysis, the objective-reasonableness standard requires that courts analyze claims of qualified immunity "on a fact-specific, case-by-case basis to determine whether a reasonable official in the defendants' position could have believed that his conduct was lawful, in light of clearly established law and the information he possessed." *Pray v. City of Sandusky*, 49 F.3d 1154, 1158 (6th Cir. 1995). Officers are entitled to qualified immunity if they made a reasonable decision, even if it was mistaken. *Srisavath v. City of Brentwood*, 243 F. App'x 909, 919 (6th Cir. 2007).

Here, particularly in light of *Chappell* and *Bouggess*, Deputies Shepherd and Reed did their best to react to rapidly-evolving circumstances.  On that day, the Supreme Court and Sixth Circuit had not squarely addressed the situation the deputies faced.  Before firing, they yelled and pleaded with Studdard to drop the knife.  Pair was also on the verge of firing, and only refrained because they fired first.  And as soon as Studdard was no longer a threat they ceased fire and did what they could to save his life.  There is no genuine dispute of material fact as to the reasonableness of their actions, even examining the record evidence in the light most favorable to the non-moving party.  Deputies Shepherd and Reed are entitled to qualified immunity, and therefore to summary judgment.

Respectfully submitted,

*/s/ E. Lee Whitwell*
JOHN MARSHALL JONES (#13289)
johnm.jones@shelbycountytn.gov
E. LEE WHITWELL (#33622)
lee.whitwell@shelbycountytn.gov
SHELBY COUNTY ATTORNEY'S OFFICE
160 North Main Street, Suite 950
Memphis, TN  38103
(901) 222-2100
*Attorneys for Defendants*

<u>Certificate of Service</u>

I certify that the foregoing is being filed via the Court's ECF system this 31st day of August, 2018, for service on all persons registered in connection with this case, including:

Daniel A. Seward, Esq.
4510 Chickasaw Road
Memphis, TN  38117


*/s/ E. Lee Whitwell*