# STUDDARD

## vs

# SHELBY COUNTY, TENNESSEE, et al.

---

# ERIN SHEPHERD

# April 13, 2018





Celebrating 26 Years of Reporting Excellence!

**Stefani Simmons, LCR, CCR**
**Senior Associate Reporter**

Chattanooga (423)266-2332   Jackson (731)425-1222
Knoxville (865)329-9919   Nashville (615)595-0073   Memphis (901)522-4477
www.elitereportingservices.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

ANGELA STUDDARD, INDIVIDUALLY AND AS
LAWFUL WIFE, NEXT OF KIN, ADMINISTRATOR AD LITEM
AND PERSONAL REPRESENTATIVE
FOR EDMOND STUDDARD, DECEASED AND
ESTATE OF EDMOND STUDDARD

       Plaintiff,

vs.               Civil Action No. 2:17-cv-02517

              JURY DEMANDED


SHELBY COUNTY, TENNESSEE
AND ERIN J. SHEPHERD, INDIVIDUALLY
AND TERRY I. REED, INDIVIDUALLY

       Defendants.
_____




              Videotape Deposition of:

              ERIN SHEPHERD

              Taken on behalf of the Plaintiff
              April 13, 2018




_____

Elite Reporting Services
www.elitereportingservices.com
Stefani Simmons, LCR, CVR, CCR(TN,MS,AR)
Senior Associate West
Memphis, Tennessee 38103
(901)522-4477

```
 1

 2                    A P P E A R A N C E S

 3

 4

 5

     For the Plaintiff:
 6
                        MR. DANIEL A. SEWARD
 7                      Attorney at Law
                        Seward Law Firm
 8                      4510 Chickasaw Road
                        Memphis, TN  38117
 9                      (901)647-5848
                        Sewardlawfirm@aol.com
10

11

12   For the Defendant:

13                      MR. JOHN MARSHALL JONES
                        MR. E. LEE WHITWELL
14                      Attorneys at Law
                        Shelby County Government
15                      160 N. Main Street, Suite 950
                        Memphis, TN  38103
16                      (901)222-2100
                        John.jones@shelbycountytn.gov
17                      Lee.whitwell@shelbycountytn.gov

18

19
     Also Present:
20
                        MR. SAM NABORS - Videographer
21

22

23

24

25
```

1

2                S  T  I  P  U  L  A  T  I  O  N  S

3

4

5              The videotape deposition of ERIN SHEPHERD

6    was taken by counsel for the Plaintiff, by Notice and

7    Agreement, at the offices of Shelby County

8    Government, 160 N. Main Street, Suite 950, Memphis,

9    Tennessee, on April 13, 2018, for all purposes under

10   the Federal Rules of Civil Procedure.

11             All formalities as to caption, notice,

12   statement of appearance, et cetera, are waived.  All

13   objections, except as to the form of the questions,

14   are reserved to the hearing, and that said deposition

15   may be read and used in evidence in said cause of

16   action in any trial thereon or any proceeding herein.

17             It is agreed that STEFANI SIMMONS, LCR,

18   Notary Public and Court Reporter for the State of

19   Tennessee, may swear the witness, and that the

20   reading and signing of the completed deposition by

21   the witness are waived.

22

23

24

25

1                              *    *    *

2

3              THE VIDEOGRAPHER:  Today is April 13th,

4    2018, and the time is approximately 9:47 a.m.  We're

5    located at the Shelby County Attorney's Office at 160

6    North Main Street in Memphis, Tennessee.

7              This is the videotape deposition of

8    Ms. Erin Shepherd in the case of Angela Studdard

9    versus Shelby County, Tennessee, et al.

10             Could counsel please identify themselves

11   for the record.

12             MR. SEWARD:  Good morning.  My name is

13   Daniel Seward, and I represent the plaintiff,

14   Angela Studdard in this cause.

15             MR. WHITWELL:  Good morning.  My name is

16   Lee Whitwell.  I represent all of the defendants.

17             MR. JONES:  John Jones.  I also represent

18   all the defendants.

19             THE VIDEOGRAPHER:  Are there any

20   stipulations you would like to add to the record?

21             MR. WHITWELL:  We'll be reserving all

22   objections other than to the form of the question.

23             THE VIDEOGRAPHER:  Could the court

24   reporter please swear in the witness.

25             (Witness sworn.)

```
 1                           *    *    *

 2                       ERIN SHEPHERD,

 3    was called as a witness and having first been duly

 4    sworn testified as follows:

 5

 6                       EXAMINATION

 7    QUESTIONS BY MR. SEWARD:

 8    Q.       Good morning, Deputy Shepherd.  Is that the

 9    correct title for your position at the Shelby County

10    Sheriff's Department, Deputy Shepherd?

11    A.       Yes, sir.

12    Q.       For the record, could you please state your

13    full legal name and spell your last name -- excuse

14    me -- for the record.

15    A.       Erin Jessica Shepherd, S-H-E-P-H-E-R-D.

16    Q.       Okay.  And you are here currently today as a

17    named defendant in the lawsuit that Angela Studdard

18    has filed; is that correct?

19    A.       Yes.

20    Q.       And are you here as a note -- as a result of

21    a notice of deposition that I issued to take your

22    deposition today?

23    A.       Yes.

24    Q.       Okay.  Have you ever given a deposition

25    before?
```

1  the shooting of Edmond Studdard or Eddie Studdard on

2  July 7th, 2016; is that correct?

3  A.     Yes, sir.

4  Q.     All right.  I'm going to ask you how long --

5  tell me a little bit just about your background.  Are

6  you from Memphis or?

7  A.     Yes, sir.

8  Q.     What part of the -- did you grow up in Shelby

9  County?

10  A.     Yes, sir.

11  Q.     Did you go to high school here?

12  A.     No, sir.

13  Q.     Where did you go to high school?

14  A.     Bartlett High School.

15  Q.     Oh, so did my parents, believe it or not.

16  A.     Oh, okay.

17  Q.     And after high school, did you attend any

18  post high school education course, like a junior

19  college, college?

20  A.     Yes, sir.

21  Q.     What -- tell me kind of -- tell me about your

22  background after you got out of college -- I mean

23  high school, sorry.

24  A.     Received my Bachelor's and my Master's in

25  criminal justice and criminology respectively from

```
 1   A.      Yes, sir.

 2   Q.      Things like that?

 3           Did you have any training in law enforcement

 4   prior to your graduating from the University of

 5   Memphis with your Master's?  Had you been an officer

 6   or a --

 7   A.      No, sir.

 8   Q.      Had you been a volunteer with any law

 9   enforcement agency during that time frame?

10   A.      During my Master's degree --

11   Q.      Um-hum.

12   A.      -- as a graduate assistant, I was assigned to

13   the CIT grant program.

14   Q.      All right.  And is that -- is that a program

15   that's funded through the City of Memphis?

16   A.      No, sir, it was federally funded.

17   Q.      Okay.  And who administers the CIT program?

18   A.      At the time it was Major Cochran with MPD and

19   Dr. Randy Dupont --

20   Q.      Okay.

21   A.      -- who was with the University of Memphis.

22   Q.      Is it -- is it mostly a Memphis Police

23   Department program though, rather than a Shelby

24   County Sheriff's Department program?

25   A.      No, sir, it's international.
```

```
 1   helped facilitate training for officers on the CIT
 2   law.
 3   Q.      Okay.  When you -- I'm going to have to stop
 4   you at certain times because I'll forget to ask the
 5   question if I don't.
 6   A.      Okay.
 7   Q.      I'm not trying to be rude to you.
 8           But so when -- you said you established
 9   programs.  Are you talking about officers from
10   different law enforcement agencies would come to the
11   CIT training program in Memphis?
12   A.      I don't believe I said I established --
13   Q.      I know, but I'm asking you.  I don't know.
14               MR. JONES:  Sir, please, don't talk over
15   the witness.
16   A.      I don't believe I said I established
17   programs.
18   Q.      Okay.  Well, what -- just tell me what you
19   did say then.  Okay?
20   A.      Okay.  I studied research --
21   Q.      Okay.
22   A.      -- and papers that have been written on
23   various different jurisdictions that were using the
24   CIT model.  And then I also helped to facilitate the
25   training of officers on the CIT Memphis model.
```

```
 1    time frame at the CIT program?

 2    A.      No, sir.

 3    Q.      Okay.  And so how long were you involved with

 4    that program?

 5    A.      For three or four semesters.

 6    Q.      Okay.  And how do -- do different law

 7    enforcement agencies make application to have

 8    officers involved in the CIT program?

 9    A.      Yes, sir.

10    Q.      How does that work; do you know?

11    A.      No, sir.

12    Q.      Okay.  You -- during -- in training under the

13    Memphis CIT program back when you were a graduate

14    assistant -- I'm focusing just on a time frame.

15    Okay?  Would officers from other law enforcement

16    agencies attend those CIT training programs?

17    A.      Yes, sir.

18    Q.      Example, Benton County Sheriff's Department

19    or?

20    A.      Yes, sir.

21    Q.      Would it -- would it be -- could it be the

22    City of Millington sending officers there?

23    A.      Yes, sir.

24    Q.      Could it be anybody in the state of Tennessee

25    that's a law -- a POST certified --
```

1    A.      It was international.

2    Q.      Okay.  Would you get law enforcement from

3    different countries coming to Memphis to attend these

4    CIT programs?

5    A.      That's what international means.

6    Q.      Okay.  All right.

7            And how big of a program is it?  What I mean

8    by that is how many enrollees would they have at one

9    time, if you know?

10   A.      I don't know.  I know that it has been going

11   on for over 30 years at this time.

12   Q.      Okay.  And the psychologist that you

13   mentioned is Dr. Dupont?

14   A.      Um-hum.

15   Q.      Does he teach in the CIT program today?

16   A.      I do not know.

17   Q.      Okay.  During the time that you were

18   undergraduate, did he teach?

19   A.      He did.

20   Q.      Okay.  And the other was -- the individual,

21   is it Cochran?

22   A.      Major Cochran, um-hum.

23   Q.      Okay.  And he's an officer with Memphis

24   Police Department, or was at the time?

25   A.      He was.  He retired, and he now works for

```
1    A.      Yes, sir.

2    Q.      -- studies I guess we'd call it?

3    A.      Um-hum.

4    Q.      Approximately what years was that -- were

5    those?

6    A.      That was 2007 to 2009.

7    Q.      Okay.  And so when you -- at some point you

8    graduate from the University of Memphis?

9    A.      Yes, sir.

10   Q.      And your degree's in what?

11   A.      My undergraduate degree was in criminal

12   justice.

13   Q.      Okay.

14   A.      And my Master's degree is in criminology.

15   Q.      What is criminology?

16   A.      It's more the study of the psychology behind

17   criminalistic behavior.

18   Q.      Why people do what they do?

19   A.      Yes, sir.

20   Q.      Okay.  As a part of that degree, did you --

21   did you take courses in psychology?

22   A.      I took a criminology course.  As part of my

23   undergraduate degree, I took a course in psychology.

24   Q.      Okay.  Are you familiar with the terms used

25   in psychology, psychiatry for -- regarding disorders
```

1    A.      If you have that information then you should
2  know it.
3    Q.      Well, I'm here to ask you questions today.
4  So I'm just asking --
5    A.      Okay.
6    Q.      -- do you recall having that or not?
7    A.      I don't have that information.
8    Q.      I'm sorry?
9    A.      I don't have that information.
10   Q.      Okay.  And you don't know if that information
11 exists, correct?
12   A.      I don't know.
13   Q.      Okay.  I'm not -- I accept your answer.  All
14 right.
15           Let's talk about at some point you applied at
16 the Shelby County Sheriff's Department.  When did you
17 apply?  Do you recall?  Not the exact date.  Just the
18 year.
19   A.      It was 2009.
20   Q.      Okay.
21   A.      2010.
22   Q.      Were you accepted in 2010 approximately?
23   A.      I was accepted in 2010.
24   Q.      Okay.  And did you attend a training academy
25 required by the Shelby County Sheriff's Department?

```
 1   A.      I did.

 2   Q.      Was that a -- was it an academy where you go

 3   there and you spend the night or is it basically like

 4   commuting from college back and forth?

 5   A.      It's just -- it's just -- eight hours during

 6   the day, and then you go home --

 7   Q.      All right.

 8   A.      -- and go back the next day.

 9   Q.      Okay.  And as far as -- tell me what -- how

10   long does it last, the training program?

11   A.      Approximately six and a half months.

12   Q.      Okay.  Is there written requirements,

13   classroom work that has to be I guess accomplished,

14   and you have to have satisfactory grades in order to

15   pass?

16   A.      Yes, sir.

17   Q.      Is there physical requirements where you have

18   to meet certain minimum requirements in order to be a

19   Shelby County Sheriff's Deputy physically?

20   A.      Yes, sir.

21   Q.      That can be running or strength and agility

22   drills or tests, correct?

23   A.      Yes, sir.

24   Q.      Is there a psychological evaluation that's

25   performed by the Shelby County Sheriff's Department
```

1    crisis?  Did you receive -- was there a specific

 2    course taught on that?

 3    A.      Yes.

 4    Q.      And is it -- so if I subpoenaed those -- the

 5    records from the training academy, I would find

 6    written literature regarding dealing with someone who

 7    is mentally -- or assume what you believe to be

 8    mentally instable -- unstable suffering from a mental

 9    crisis and/or mentally incompetent.

10    A.      Yes.

11    Q.      You're confident of that?

12    A.      Yes.

13    Q.      Okay.  And how long of a course was that on

14    that -- on that very specific topic?

15    A.      I believe 32 hours.

16    Q.      And this is before you became a Shelby County

17    Sheriff's Deputy, right?

18    A.      While I was at the training academy.

19    Q.      Right.  But were you a deputy --

20    A.      No.

21    Q.      -- while at the academy?  Or you're a deputy

22    upon graduation, aren't you?

23    A.      Right.

24    Q.      Okay.  So prior to graduation, you received

25    32 hours specifically in dealing with people with

1    Q.      Okay.  And when you say CIT training, that's

2    basically a full week, a 40 hour training program,

3    where crisis intervention training is provided?

4    A.      Um-hum.

5    Q.      And at the conclusion of that 40 hour week,

6    do you have to take a test?

7    A.      I don't recall.

8    Q.      Or do you -- if you show up and you're there

9    for the whole 40 hours do you still get your

10   certificate that says I'm CIT qualified?

11   A.      I don't recall if there was a written exam.

12   I know there was a practical examination.

13   Q.      And when you say practical examination, is

14   that an examination you have with an instructor, a

15   verbal examination or not?

16   A.      No, sir, Scenarios where we would act out

17   what we had been taught and someone would act as a

18   middle consumer practice.

19   Q.      You would role play?

20   A.      Yes, sir.

21   Q.      Okay.  And was there a pass/fail in role

22   playing or was that just part of the education?

23   A.      It's part of the education.

24   Q.      Okay.  To your knowledge, there is no written

25   examination at the end of the 40 hour week to receive

1    officer, were you?

2    A.      Yes, I was.

3    Q.      Okay.  Well, this is my question then.

4            Did the sheriff -- on that date did the

5    Sheriff's Department not have select deputies who

6    only performed as the crisis intervention team

7    members when responding to a call where there is some

8    type of issue with a suspect who may have some type

9    of mental issue or mental crisis or mental

10   incompetence?

11   A.      Let me -- let me -- repeat to you what I feel

12   that you're asking me.

13   Q.      Okay.

14   A.      I was a full-time CIT officer, but I did not

15   solely respond to calls in which people were in

16   crisis.  I was also able to respond to calls where

17   people were not in crisis.

18   Q.      Right.  I understand that.  Let me see if I

19   can make this a little clearer.  I'm going to try to

20   use an analogy with you.  Okay?

21   A.      Okay.

22   Q.      If you as a Shelby County Sheriff's Deputy

23   show up at a scene, let's say a husband has his wife

24   and kids locked in the house and he has a gun --

25   A.      Okay.

```
 1   close to Big Orange Road and Macon Road, and it's
 2   kind of an industrial area.
 3   A.      Um-hum.
 4   Q.      Okay.  There's businesses there.  There's
 5   subcon -- you know, Conway Heating and Air is on that
 6   street.  The Memphis Cheer Elite All-Stars cheering
 7   training camp's on that road, right?
 8   A.      Um-hum.
 9   Q.      Couple of other heating and air companies are
10   on that road or just different businesses,
11   landscaping --
12   A.      Right.
13   Q.      -- is that correct?  And so when you hear
14   that first broadcast from Deputy Lane, Deputy Lane
15   also states that the suspect's not acting aggressive
16   toward him, didn't he?
17   A.      He did.
18   Q.      Okay.  So -- and then at that time, you had
19   no information that whoever that suspect was was a
20   fleeing felon, did you?
21   A.      I had no information other than he had a
22   weapon.
23   Q.      Okay.  You had no other information that he
24   had injured anybody, right?
25   A.      Other than himself.
```

1   Big Orange Road?

2   A.      That's correct.

3   Q.      All right.  Tell me -- tell me about what

4   happened when you got to Big Orange Road.

5   A.      Okay.  When we got to Big Orange Road we

6   pulled north of the suspect, and I exited my vehicle.

7   Q.      Okay.  So when you first saw Eddie Studdard

8   was he walking northbound on Big Orange Road?

9   A.      He was.

10  Q.      All right.  And Big Orange Road runs north

11  and south.  Can we agree on that?

12  A.      Yes.

13  Q.      And it's a two-lane road?

14  A.      Yes.

15  Q.      And there's a big double yellow line runs

16  right through the middle of Big Orange Road, isn't

17  there?

18  A.      I would have to see it.  I don't have every

19  road memorized.

20          MR. WHITWELL:  Do you want to go ahead

21  and mark that.

22          MR. SEWARD:  Yeah, this is for ID Number

23  1.

24  BY MR. SEWARD:

25  Q.      Deputy Shepherd, I'm going to pass you ID

1    testified when you -- when you first arrived, you

2    don't recall how you got there, whether it was from

3    the entrance at Macon and Big Orange Road or the

4    other entrance which comes on the west side of the

5    complex?

6    A.       I know that it was not from the north end.  I

7    know it wasn't from Macon turning south down to.  So

8    I don't recall if we went Cordova Park --

9    Q.       Okay.

10   A.       -- to Big Orange or if we went behind that.

11   Q.       Okay.  And looking at that photograph, when

12   you first saw the person -- did you see a person

13   eventually that was Eddie Studdard?

14   A.       I did.

15   Q.       Okay.  Was he walking in the northbound lane

16   of Big Road when you saw him?

17   A.       Yes.

18   Q.       Was he close to the side of the road or in

19   the road?

20   A.       I don't recall.

21   Q.       Okay.  But he was -- he was heading north,

22   right?

23   A.       That's correct.

24   Q.       Okay.  And was Deputy Lane behind him on his

25   motorcycle at that point?

1    the northbound lane in Exhibit Number 1, walking,

2    going toward Macon at some point, right?

3    A.      That's correct.

4    Q.      How far behind him was Deputy Lane, if you

5    know?

6    A.      Approximately 20 feet.

7    Q.      Okay.  And was Eddie Studdard just walking or

8    running?  What was he doing?

9    A.      He was walking very carefully.

10   Q.      Okay.  And what was Deputy Lane doing?

11   A.      Riding his motorcycle slowly.

12   Q.      Okay.  And how long did you observe

13   Eddie Studdard when you first got there before you

14   took any action?

15   A.      As soon as we stopped in front of him, I

16   exited the vehicle.

17   Q.      Okay.  So at no point were you ever heading

18   north on your vehicle past Eddie Studdard before you

19   stopped?

20   A.      Yes, that's what I just said.  We went north

21   and stopped in north of him.

22   Q.      But did you drive by him in your truck?

23   A.      I did not drive.  I was the passenger.

24   Q.      Okay.  The truck in which you were a

25   passenger, did it ever pass Eddie Studdard from

```
 1    behind and go around him?

 2    A.      Yes.

 3    Q.      Okay.  And did you have to go over into the

 4    southbound lane in order to do that?

 5    A.      Yes.

 6    Q.      Okay.  When you drove by Eddie Studdard you

 7    saw him, right?

 8    A.      Yes.

 9    Q.      And how did he appear to you when you saw

10    him?

11    A.      He was covered in blood and appeared to have

12    a weapon in his hand.

13    Q.      Okay.  He had blood all over him?

14    A.      Yes.

15    Q.      Blood on his face?

16    A.      Yes.

17    Q.      Okay.  Would it surprise you that Deputy Lane

18    didn't see any blood on his face?

19    A.      I can't speak on what Deputy Lane saw or did

20    not see.

21    Q.      Okay.  And so when you pulled around him, how

22    did y'all -- how do y'all -- how did you make the

23    decision of how to encounter Eddie Studdard?

24    A.      I don't understand the question.

25    Q.      Well, let me rephrase.  At this point, you
```

1    knew -- let's see if we can agree to some things.

2          You knew you had a suspect walking down Big

3    Orange Road heading north on foot, right?

4    A.      That's correct.

5    Q.      Okay.  He wasn't going to ram anybody's car

6    while he's on foot, is he?

7    A.      No.

8    Q.      Okay.  He hadn't hurt anybody else except

9    himself at that point, right?

10   A.      I did not know that.

11   Q.      Well, I'm -- okay.  Well, did you ever see

12   him attack Officer Lane before you took any action?

13   A.      No.

14   Q.      Could he have turned around and charged

15   Officer Lane when you saw him?

16   A.      Yes.

17   Q.      He didn't do that, did he?

18   A.      He -- not at that time.

19   Q.      I'm just talking about that time.

20   A.      Okay.

21   Q.      When you first saw him you never saw him take

22   any aggressive action toward Deputy Lane, right?

23   A.      No.  He was waving his knife erratically.

24   Q.      We're going to get to that.  Okay?

25   A.      Okay.

```
 1           MR. JONES:  Well, if that's the answer,
 2   that's the answer.
 3   BY MR. SEWARD:
 4   Q.      Well, just let me ask a follow-up question.
 5           He was waving the knife like that as soon as
 6   you saw him?
 7   A.      When I stopped and got out?
 8   Q.      We're going to walk this step-by-step.
 9           At the time you first saw him was he waving
10   the knife?
11   A.      No.
12   Q.      All right.  You go around him.  And I'm going
13   to ask you a question.
14           How -- you knew this person was dealing with
15   some type of mental issue, didn't you, at that point,
16   right?
17   A.      No.
18   Q.      Someone slit their wrists walking down the
19   street, you don't think they have a mental issue?
20   A.      We didn't know what was going on.
21   Q.      You knew he had slit his wrists, right?
22   A.      We knew that he was bleeding, or had blood on
23   him, and had a weapon.
24   Q.      Did you have any notice that Deputy Lane had
25   broadcast that he had slit his wrists but not acting
```

1    A.      To my recollection.

2    Q.      Okay.  And so you would have been -- as a

3    passenger, Mr. Studdard would have been to your

4    right; is that fair?  Or behind you still?

5    A.      He was -- when I got out of the car, he was

6    to my southeast.

7    Q.      Okay.  But you don't know what lane of

8    traffic you stopped in, right?

9    A.      I didn't stop so I don't know what lane it

10   was.

11   Q.      Okay.  When I say you stopped, I'm referring

12   to Deputy Pair stopping the truck in which you were a

13   passenger in.

14   A.      Okay.

15   Q.      So in the future whenever I say that, that's

16   what I'm referring to just regarding the truck

17   stopping.

18   A.      Okay.

19   Q.      So when the truck stopped, how far were you

20   from Eddie Studdard?

21   A.      I was about 25 feet.

22   Q.      25 feet from Eddie Studdard?

23   A.      Yes.

24   Q.      Okay.  So when you got out, was he still

25   walking towards you?

```
1   A.      Yes.

2   Q.      All right.  And when you got out of the

3   truck, did you walk toward him?

4   A.      No.

5   Q.      You stood by the truck?

6   A.      No, I -- well, yes, I did -- I did walk -- I

7   didn't walk directly towards him.  I walked farther

8   down the street.

9   Q.      Okay.  So you were -- you started walking

10  southbound on Big Orange Road?

11  A.      Um-hum.

12  Q.      Where were you at on the road when you were

13  walking?

14  A.      I was on the southbound lane.  In the

15  southbound lane.

16  Q.      Okay.  Did Deputy Reed ever show up?

17  A.      He did.

18  Q.      Same time or after you showed up?

19  A.      Right after me.

20  Q.      Okay.  So you got out of your -- the truck.

21  Pull your gun?  Draw your gun?

22  A.      I did.

23  Q.      Okay.  And you said Mr. Studdard was 25 feet

24  from you when you first got out of the truck?

25  A.      It was about 20 -- about 20 feet.
```

```
1    Q.      20 feet from you when you first got out of
2    the truck from where he was located, right?
3    A.      Yes.
4    Q.      You understand my question.
5    A.      From when I first got out of the truck.
6    Q.      Right.
7    A.      Yes.
8    Q.      And then where was -- was he -- was he in the
9    road, northbound lane or was he in grassy area?
10   A.      He was in the grassy area.
11   Q.      And that would be the grassy area on the
12   eastern side of Big Orange Road, correct?
13   A.      Yes.
14   Q.      And in between -- and there's a curve there
15   on Big Orange Road that a grassy area starts and then
16   there's a wooden fence behind that, right?
17   A.      That's correct.
18   Q.      And that all on the eastern side of Big
19   Orange Road?
20   A.      That's correct.
21   Q.      Okay.  Did he walk up into the grassy area?
22   A.      He was already in the grassy area.
23   Q.      Okay.  And you were in the southbound lane?
24   I'm sorry.  I didn't mean to cut you off.
25   A.      I was in the southbound lane.
```

1    to the fence?

2    A.      I don't know.

3    Q.      Does that sound about right?

4    A.      I don't know.

5    Q.      Okay.  Was he closer to the street or closer

6    to the fence or somewhere in the middle?

7    A.      He was somewhere in the middle.

8    Q.      Okay.  And what was he doing while he was in

9    the middle of the grass there?

10   A.      Once I got out of the vehicle?

11   Q.      Right.  The second you looked at him when you

12   got out of the vehicle, what was he doing?

13   A.      He was walking.

14   Q.      Okay.

15   A.      And I got out of the vehicle, and he started

16   waving what appeared to be a bladed weapon around.

17   Q.      Okay.  Was he waving it while he was in the

18   street on northbound Big Orange Road?  Or was he

19   waving it when he's up in the grassy area?

20   A.      I don't recall.

21   Q.      Okay.  Could you show the videographer what

22   you mean by waving the weapon?  Show us with your

23   hands what he was doing.

24   A.      (Complies.)

25   Q.      Okay.  And what did you interpret that to

1    mean?

2    A.      It was just concerted movements.

3    Q.      Okay.  Did he stop walking when he saw you?

4    A.      He did.

5    Q.      Okay.  And then Deputy Reed, was he in the

6    southbound lane with you?

7    A.      He was in the southbound lane, yes.

8    Q.      Okay.  Where was Deputy Pair?

9    A.      Deputy Pair was in the northbound lane to the

10   northeast of me.

11   Q.      Okay.  And Deputy Pair gave testimony in his

12   statement to Shelby County Sheriff's Department that

13   he was the closest one to Eddie Studdard.  Do you

14   dispute that?

15   A.      I don't know.

16   Q.      Do you dispute it?

17   A.      I don't know.

18   Q.      Do you think you were closer to

19   Eddie Studdard than Deputy Pair?

20   A.      I don't know.

21   Q.      Well, how far was Deputy Pair from

22   Eddie Studdard when you -- when you got out of the

23   truck and he got out of the truck?

24   A.      I don't know.

25   Q.      Okay.  If you were looking at Eddie Studdard,

```
1    Q.      Okay.  And had you closed in on him?

2    A.      We were exactly where we were.  So --

3    Q.      Okay.

4    A.      -- that was as close as we were getting to

5    him.

6    Q.      Okay.  And then so when you -- when you were

7    stopped there, how far away from the truck were you

8    from Mr. -- Deputy Pair's truck?

9    A.      I don't recall.

10   Q.      5, 10 feet?

11   A.      I was looking in front of me at a bloody man

12   with a weapon.  I was not looking behind me at a

13   vehicle.

14   Q.      Okay.

15   A.      So I couldn't tell you.

16   Q.      Were you fairly close to the truck though,

17   you think?

18   A.      I don't know.

19   Q.      Do you know if you walked toward

20   Eddie Studdard?

21   A.      I walked out towards the middle of the

22   street.  I walked away from the truck.

23   Q.      Okay.  And why did you walk -- why did you do

24   what you did?

25   A.      So that we could try to contain him.
```

```
 1    Q.      Okay.  All right.

 2            And was anybody moving in on him?

 3    A.      No, we were all -- well, moving in from where

 4    we had started, but Lane stopped where he was.  Pair

 5    exited his vehicle.  And I could see him in my

 6    peripheral this way.

 7    Q.      Okay.  You're talking about Pair?

 8    A.      Pair.

 9    Q.      Okay.

10    A.      And then I knew that Reed was in my

11    peripheral this way.

12    Q.      Okay.  Could you see him?

13    A.      Yes.

14    Q.      Okay.  And could you see Deputy Lane?

15    A.      I wasn't looking at Deputy Lane.  He was --

16    Q.      Okay.  There was nothing between you and

17    Deputy Lane that would obstruct your view in other

18    words?

19    A.      No.

20    Q.      Okay.  This was a clear day in July of 2016?

21    A.      Yes.  At that time I was not looking at him.

22    I was looking at the suspect.

23    Q.      I'm just -- I'm just talking about the view

24    from the street that day.  There was no obstructions

25    that would prevent you from seeing at the same time
```

```
1    you saw Eddie Studdard, you could also see

2    Deputy Lane.  Peripherally you could see Deputy Pair.

3    Peripherally you could see Deputy Reed, right?

4    A.       That's right.

5    Q.       So it was open space between -- you're in

6    kind of a semicircle you described?

7    A.       Right.

8    Q.       Eddie Studdard had a fence behind him, right?

9    A.       That's right.

10   Q.       Did he try to jump the fence?

11   A.       No.

12   Q.       Did he throw the knife at anybody?

13   A.       No.

14   Q.       Did he try to attack Deputy Lane with the

15   knife -- or the box cutter?

16   A.       He started walking towards Deputy Lane.

17   Q.       Did he try to attack him though in your

18   presence ever?

19            MR. WHITWELL:  Objection to the form of

20   the question.

21   BY MR. SEWARD:

22   Q.       You can answer.

23   A.       I don't know if there was intentional

24   attacking him or not, but he started walking towards

25   him.
```

1    walking down the road, where were his hands?

2    A.       By his side.

3    Q.       Okay.  Could you see he had anything in his

4    hand at that point?

5    A.       I saw that he had what appeared to be a

6    bladed weapon in his hand.

7    Q.       Describe it for me.

8    A.       It was just shiny, and that's really all I

9    could see.

10   Q.       Did you get a good look at it?

11   A.       It appeared to be something that was folding.

12   There was so much blood it was hard to tell exactly

13   color or size.

14   Q.       What do you mean by folding?

15   A.       There -- like there's a certain angle.  Like

16   there's a straight blade --

17   Q.       Um-hum.

18   A.       -- that's just straight.  And then folding

19   and it creates more of an angle.

20   Q.       Okay.  And that's what you -- that's what you

21   saw, right?

22   A.       Right.  That's what I perceived at the time.

23   Q.       How long was the blade that you saw?

24   A.       I don't recall.

25   Q.       Was it two inches or was it longer than two

```
1   Q.      When he was walking he had it like opened up
2   here?
3   A.      No, when he was walking he had it on --
4   Q.      Could you stand up for me, please?  I hate to
5   ask you, but do you mind?
6   A.      Not at all.
7   Q.      Okay.  When you first saw him, show me
8   what --
9   A.      I don't know what side it was on he was
10  walking.
11  Q.      If your statement -- yeah, if your statement
12  said he had it in his left hand, is that correct?
13  A.      Well, my statement I believe said that he had
14  it in his left hand when he put it up to his throat.
15  Q.      Okay.  Well --
16  A.      So I'm not sure when he was walking if it --
17  Q.      Okay.
18  A.      -- was in his right hand or his left hand.
19  Q.      So as he was walking, where -- what were the
20  movements of his hands with whatever the object was
21  in his hand?
22  A.      He was just walking briskly.
23  Q.      Okay.  Was he pointing it at anybody while he
24  was walking?
25  A.      Not while he was walking.
```

1    A.       About five feet towards Deputy Lane.

2    Q.       Okay.  And Deputy Lane was off his motorcycle

3    at this point, right?

4    A.       From what I recall, yes.

5    Q.       He had his gun pointed at him, right?

6    A.       Yes.

7    Q.       How far was he from Mr. Studdard when you --

8    when he's walking towards him?

9    A.       10, 15 feet.

10   Q.       Okay.  Did Deputy Lane shoot?

11   A.       No.

12            MR. WHITWELL:  Can she sit down?

13   BY MR. SEWARD:

14   Q.       I'm sorry.  Well, I'm going to the next now.

15   Can you stand up just one more minute?

16   A.       I can.

17   Q.       At some point, did he turn around and come

18   back to where he was?

19   A.       He turned around and -- came back, started

20   walking towards Deputy Reed and I.

21   Q.       Okay.  How far -- okay.  And how far did he

22   walk towards you and Deputy Reed?

23   A.       We let him get about seven to 10 feet before

24   we opened fire.

25   Q.       Okay.  That's not my question.

```
 1    is.  Okay?

 2    A.      I mean I have.

 3    Q.      Okay.

 4    A.      I don't recall.

 5    Q.      All right.  So when Mr. Studdard was shot the

 6    first time, did he fall down?

 7    A.      No.

 8    Q.      He didn't fall down?

 9    A.      No.

10    Q.      All right.  He was in the grassy area, right?

11    A.      Yes.

12    Q.      What did he do?

13    A.      Stood there.

14    Q.      With the knife up to his throat?

15    A.      We fired --

16            MR. JONES:  Object to the form.

17            MR. SEWARD:  This is cross-examination.

18    She's an adverse witness.  You have objections to the

19    rest of my questions today.

20            MR. JONES:  There are other objections to

21    the form of the question than leading.

22            MR. SEWARD:  Well, state it then.

23            MR. JONES:  I don't have to.  If you want

24    me to I will.

25            MR. SEWARD:  Well, I'll stand by what I
```

1    Q.      Your testimony here today is Deputy Reed

2    fired the first shot and Mr. Studdard didn't fall to

3    the ground immediately.

4    A.      Yes.

5    Q.      Is that your testimony?

6    A.      Yes.

7    Q.      How long did he stand there?

8    A.      I don't know.  We both -- he fired the first

9    shot, then I fired.  As soon as Mr. Studdard went to

10   the ground, we stopped firing and holstered our

11   weapons.

12   Q.      So your testimony here today is five shots

13   were fired before Mr. Studdard went to the ground?

14   A.      I never said that.

15   Q.      Well, I'm asking you if five shots were

16   fired --

17   A.      I never said that.

18   Q.      I'm telling you five shots were fired.

19   A.      Okay.

20            MR. JONES:  Object to the form.

21            MR. SEWARD:  That's fine.

22   BY MR. SEWARD:

23   Q.      I'll represent to you the TBI reflects

24   Mr. Studdard was shot at five times on July 7th,

25   2016.  Are you with me so far?

1  A.      I ran up to him and went to reach down to
2  touch him, and Terry Reed stopped me and hit the --
3  what appeared to be the bladed weapon out of his
4  hand.
5  Q.      Did Deputy Pair kick him too?
6  A.      I don't know what Deputy Pair was doing.
7  Q.      Okay.
8  A.      And Deputy Reed didn't kick him.  So there
9  wouldn't be any kicking him too.  He kicked the blade
10  away from him.
11  Q.      Was the blade in his hand on the ground or
12  was it next him?
13  A.      It was the -- in his hand.
14  Q.      So he would have to kick his hand with the
15  blade in it to knock the blade out of his hand,
16  right?
17  A.      I guess.  I mean, I wasn't looking at that.
18  I was trying to assess his injuries.
19  Q.      All right.  And did you ever pick up the
20  blade?  Or whatever was in his hand, did you ever go
21  over and look at it or pick it up?
22  A.      No.
23  Q.      All right.  And first aid was administered, I
24  see from the report, to Mr. Studdard?
25  A.      Yes.

```
1    Q.      Did you and Deputy Lane administrate the
2    first aid?
3    A.      I did.  Deputy Lane did and countless others.
4    I can't recall.
5    Q.      Well, immediately before everybody showed up,
6    there was only you guys -- or four deputies and
7    Mr. Studdard and maybe or maybe not Deputy Abdullah,
8    right?
9    A.      Correct.
10   Q.      Did you notice Deputy Abdullah there when you
11   were rendering first aid?
12   A.      No, I was looking down talking to the suspect
13   trying to get him to stay positive.
14   Q.      Okay.  Could you tell he was hurt badly when
15   you first saw him?
16   A.      Yes.
17   Q.      He had a bullet wound to his arm, right?
18   A.      I don't know what was a bullet wound or what
19   wound was what.  Like you said --
20   Q.      Okay.
21   A.      -- I'm not ballistics expert.
22   Q.      Did you see blood?
23   A.      There was blood everywhere, yes.
24   Q.      All right.  Did you see blood on his neck or
25   his throat?
```

1    dogs, German Shepherds or dogs of some type they have
2    in patrol cars?
3    A.      In the K-9 unit they do.
4    Q.      Is a dog ever used to disarm someone with
5    a weapon?
6    A.      I'm not a K-9 officer.
7    Q.      You don't know either way?
8    A.      I don't know.
9    Q.      You don't know if that's an option you have
10   to call a K-9 officer?
11   A.      It's an option to call a K-9 officer if
12   someone's not approaching you.
13   Q.      Did you -- anybody call for a K-9 officer
14   that day?
15   A.      No.
16   Q.      Do you know if anyone --
17   A.      I mean, I don't know.  It happened in 30
18   seconds.
19   Q.      Do you know if anyone used a beanbag gun to
20   control or bring Mr. Studdard into custody?
21   A.      I already told you we don't have those.
22   Q.      Shelby County Deadly Force Policy and
23   Purpose, and I will refer to page 5 of 12, subsection
24   C.  I'm going to read you something and see if you
25   agree with this.  "The on duty supervisor must

1    When you first got there, did you and

2    Deputy Pair discuss what to do with this fellow

3    walking down the street or how to approach the

4    situation before you got there?

5    A.    I told him to pull in front of him.

6    Q.    All right.  And what did he say?

7    A.    Okay I guess.  I don't know.  I just said

8    since Lane's behind him, pull in front of him so we

9    can try to stop his forward movement.

10   Q.    Okay.  It was more to confine him though,

11   right?

12        MR. JONES:  Object to the form.  Let her

13   testify.

14   BY MR. SEWARD:

15   Q.    I'm asking clarification.

16        Was it more to confine him though, right,

17   confine him in a space?

18   A.    It was to stop his forward movement.  That

19   was our role, was to stop his forward movement.

20   Deputy Lane had stopped his backward movement.

21   Q.    Okay.  Well, Deputy Pair gave a statement to

22   the Internal Affairs Bureau, whatever the name is.

23   Do you know -- you gave one too, didn't you?

24   A.    I did.

25   Q.    And Deputy Pair said on page three of his

1          C E R T I F I C A T E

2

3   STATE OF TENNESSEE

4   COUNTY OF SHELBY

5          I, STEFANI SIMMONS, Licensed Court Reporter,

6   with offices in Memphis, Tennessee, hereby certify

7   that I reported the foregoing videotape deposition of

8   ERIN SHEPHERD by machine shorthand to the best of my

9   skills and abilities, and thereafter the same was

10  reduced to typewritten form by me.

11         I further certify that I am not related to

12  any of the parties named herein, nor their counsel,

13  and have no interest, financial or otherwise, in the

14  outcome of the proceedings.

15         I further certify that in order for this
    document to be considered a true and correct copy, it
16  must bear my original signature and that any
    unauthorized reproduction in whole or in part and/or
17  transfer of this document is not authorized, will not
    be considered authentic, and will be in violation of
18  Tennessee Code Annotated 39-14-104, Theft of
    Services.

19

20

21

22  STEFANI SIMMONS, LCR, CCR
    Elite Reporting Services
23  Senior Associate - West and
    Notary Public State of Tennessee

24
    My Notary Commission Expires:  5/30/2021
25  LCR #373 - Expires:  6/30/2018