1          IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF TENNESSEE
2                WESTERN DIVISION

3   ―――――――――――――――――――――――――――――――

4

5  ANGELA STUDDARD,
   Individually and as
   lawful wife, next of kin,
6  administrator ad litem,
   and personal
7  representative for EDMOND
   STUDDARD, Deceased, and
8  Estate of Edmond
   Studdard,
9
       Plaintiff,
10
   vs.               Case No. 2:17-cv-02517
11
   SHELBY COUNTY, TENNESSEE;
12  ERIN J. SHEPHERD,
   Individually; and
13  TERRY I. REED,
   Individually,       ORIGINAL
14
15
       Defendants.
16

17  ―――――――――――――――――――――――――――――――

18          Videotape Deposition of:
         TERRY REED
19
         Taken on behalf of the Plaintiff
20        February 21, 2018

21

22  ―――――――――――――――――――――――――――――――

23          Elite Reporting Services
        www.elitereportingservices.com
24  Candace Covey, LCR, RPR, CRR, CVR-CM - Associate West
         Memphis, Tennessee 38103
25          (901) 522-4477

1     deal with a suspect who you believed to be suffering
2     from mental illness, mental incompetence, and/or a
3     mental crisis?
4     A.     All right.  Well, it's a long question.  But
5     what do you mean do -- you saying do they tell -- is
6     there -- when you say "dictate," are you saying, is
7     there a policy that says exactly what to do?
8     Q.     Right.
9     A.     I can't answer that.  I don't know if there's
10    a policy that says exactly what to do when dealing
11    with a mental consumer.
12    Q.     On July 7th, 2016, did Shelby County
13    sheriff's department have any written policy or rules
14    that dealt with dealing with a suspect who was
15    suffering from a mental crisis, mental incompetence
16    or mental disability?
17    A.     Are there policies with -- dealing --
18    Q.     Written.
19    A.     -- with mental consumers?
20          THE WITNESS:  Is that what he's asking?
21    BY MR. SEWARD:
22    Q.     I'm asking you, only regarding -- I'm talking
23    about, you know the Shelby County sheriff's
24    department has an excessive force written policy,
25    don't they?  Written.  Written means printed, right?

```
1   A.      Yes.   They have a use of force policy, yes.
2   Q.      Okay.   It's written, though, right?  When I
3   say "written," this is what I'm referring to, a
4   written rule?
5   A.      Yeah.  But you said "dictate," meaning --
6   that's why I said, are you saying it's saying exactly
7   what we're supposed to do?
8   Q.      Okay.  Well, let me see if I can clarify
9   something.
10          Does the Shelby County have an excessive
11  force policy that's in writing?
12  A.      Excessive force?  We have a use of force
13  policy that's in writing.  Yes, we do.
14  Q.      And that's a rule that you have to abide by
15  and go by in the performance of your job as a
16  sheriff's deputy, right?
17  A.      Well, does -- so that policy also -- it also
18  gets dictated by the suspect and in the situation
19  we're in.
20  Q.      I understand.  I'm not asking you about what
21  the suspect does or doesn't do.  I'm just talking
22  about on a piece of paper, is there a written rule
23  regarding Shelby County's use of force?
24  A.      On a piece of paper, there is a use of force
25  policy.
```

```
1    Q.    Okay.  Same question regarding dealing with a
2    suspect with mental illness, mental crisis or mental
3    incompetence:  Does Shelby County have a written rule
4    anywhere that you know of as to how to possibly deal
5    with those type of people?
6    A.    On how to deal with them?
7    Q.    Right.  Or how you should deal with them?
8    A.    Are you saying how we should or what we're
9    supposed to do with them?
10   Q.    Correct.
11   A.    I'm not sure.  Because I haven't read
12   somewhere that says you have to do this.
13   Q.    Well, you can't refer to any written rule
14   that you've had to abide by on July 7th, 2016,
15   regarding that, right?
16   A.    No.  I'm saying there's nothing that says you
17   have to do something with a policy.
18   Q.    Okay.  Do you believe Shelby County doesn't
19   have a written policy regarding dealing with suspects
20   who are suffering from mental crisis, mental
21   incompetence and/or mental disability?
22              MR. JONES:  Object to the form.  You can
23   answer.
24   BY MR. SEWARD:  You can answer.
25   A.    I'm not sure if we have a policy saying that
```

| 1 | you have to do something with a mental consumer. |
|---|---|
| 2 | Q.    Okay.  Likewise, since July 7th, 2016, up |
| 3 | till today's date, you're not aware of any new rules |
| 4 | or changes -- and I'm referring to written rules -- |
| 5 | issued by Shelby County sheriff's department in how |
| 6 | to deal with a suspect who is suffering from mental |
| 7 | crisis, mental illness or mental incompetence? |
| 8 | A.    Between those dates, I do not know if we have |
| 9 | a policy that says you have to deal with them in a |
| 10 | certain way. |
| 11 | Q.    Okay.  So whatever -- whatever the rules |
| 12 | stated, if they stated anything at all on July 7, |
| 13 | 2016 are the same rules you work by on today's date, |
| 14 | February the 21st, 2018? |
| 15 | A.    When you say -- when you're saying "the |
| 16 | rules," there's nothing that says how you have to |
| 17 | deal with a mental consumer. |
| 18 | Q.    Okay.  As of today's date also, that -- that |
| 19 | would be your same answer, if I asked you about |
| 20 | today's date, right? |
| 21 | A.    As of today's date, I have -- there's no rule |
| 22 | that says you have to deal with them a certain way. |
| 23 | Q.    Okay.  That's fair enough. |
| 24 | And if you'll allow me one second here. |
| 25 | I'm ready when you are. |

```
1              What about were you wearing a body cam on

2    July 7th, 2016?

3    A.      No.

4    Q.      Is there a requirement -- or -- to wear a

5    body cam while you're on patrol?  Or if you're in

6    plainclothes working for a PCRU, are you exempt?

7    A.      When we were at PCRU, we were not required to

8    wear body cams.

9    Q.      Okay.  Is there a written rule regarding

10   that?

11   A.      I'm not sure.

12   Q.      If I wanted to find out, who would I go to to

13   find out if there's a written rule that officers

14   assigned to PCRU do not have to wear body cams?

15   A.      Probably have to go talk to our supervisors

16   and ask.

17   Q.      Who was your supervisor?

18   A.      At that time, it was Lieutenant Roberston.

19   Q.      Is he still with the department?

20   A.      Yes.

21   Q.      Is it R-O-B-E-R-S-O-N?

22   A.      R-O-B-E-R-T-S-O-N.

23   Q.      Oh, Robertson.  I'm sorry.  Is he at the

24   Arlington, or is he downtown?

25   A.      I'm not sure where he's at right now.
```

```
 1    car that recorded events?

 2    A.       In all the Shelby County deputies?

 3    Q.       Most or -- most that were on patrol.

 4    A.       That are on patrol?  I wasn't on patrol.

 5    Q.       Okay.  Do you -- is it a requirement that all

 6    the cars issued to patrol officers in PCRU, that

 7    their vehicles have dash cams or some type of video

 8    camera in the car?

 9    A.       Being on patrol and being in PCRU are two

10    different units.

11    Q.       Okay.  Patrol cars, are they required to have

12    dash cams?

13    A.       The patrol cars?

14    Q.       Yes.

15    A.       So the marked units?

16    Q.       Sir?

17    A.       So you're saying the marked units?

18    Q.       Yes.

19    A.       The marked units have dash cams, yes.

20    Q.       And this -- and this was -- these questions

21    all go to July 7th, 2016.  I'm not asking today.  All

22    these questions are to that day.

23    A.       All right.

24    Q.       Okay?

25    A.       And on July 7th, 2016, the marked units have
```

```
 1   got into that morning.
 2   Q.     Okay.  And what about do you know -- this
 3   question applies to Erin Shepherd, Samuel Pair, and
 4   Abdullah.  I'll just -- it refers to all three
 5   individuals, the next question.  Okay?
 6   A.     Okay.
 7   Q.     On July 7th, 2016, do you know of any
 8   requirement that any of those three would have to
 9   wear a body cam for any reason?
10   A.     I'm not -- with Sam Pair and Erin Shepherd,
11   they were -- they were under the same requirements as
12   me.  They didn't have body cams on.  I don't know
13   what Abdullah had on.
14   Q.     Okay.  The same thing with any dashboard cam,
15   same question, except on the same day, do you know of
16   any reason that would require either Samuel Pair,
17   Erin Shepherd or Abdullah to have a dash cam or some
18   kind of recording event in their car that they were
19   driving or a passenger in?
20   A.     They might have.
21   Q.     But do you know of any requirement that would
22   require them to have that in their car?
23   A.     Required for them?
24   Q.     Right.
25   A.     I'm not sure.  I mean, they might have one.
```

```
 1   I'm not -- I mean...

 2   Q.    Okay.  And since the date of July 7th, 2016,

 3   have you talked to Erin Shepherd?

 4   A.    Have I talked to her since that day?

 5   Q.    Uh-huh.

 6   A.    Yes.

 7   Q.    When have you talked to her?

 8   A.    I talked to her a bunch.

 9   Q.    Well --

10   A.    You're asking me when.  I can't point out --

11   I can't say on July 8th or whatever.  I don't know

12   the dates.  I mean, like I said, I don't mark down

13   every time I do something.  So I would have to go

14   through, like, phone records or something and see

15   every time I talked to her.

16   Q.    Right.  Where are you assigned right now?

17   Where?

18   A.    I am a detective with the Shelby County

19   narcotics division.

20   Q.    Okay.  Do you work out of 201 Poplar or are

21   you --

22   A.    Do I work out of 201 Poplar?

23   Q.    Uh-huh.

24   A.    No.

25   Q.    Okay.  So it's a different location where
```

```
1    you --
2    A.    Yes.
3    Q.    Okay.  And you on a Madison office, on
4    Madison Avenue?
5    A.    No.
6              MR. JONES:  Why don't you ask him what
7    office he's at?
8              MR. SEWARD:  That might be the easiest
9    way to do it.  Thank you, John.
10   BY MR. SEWARD:
11   Q.    What office are you currently working out of?
12   A.    At 5295 East Shelby Drive.
13   Q.    Okay.  And that's where -- is that where the
14   central Shelby County narcotics unit is located?
15   A.    That's where I'm located.
16   Q.    Okay.
17   A.    I don't know if there's a central or east,
18   west, north.  I just know that's where I'm located.
19   Q.    Okay.  And your rank today is detective,
20   though, correct?
21   A.    Yes.
22   Q.    All right.  I guess you're involved in
23   investigation and arrest of drug suspects, right?
24   A.    Yes.
25   Q.    Illegal activity of various nature --
```

```
1    A.      Yes, sir.
2    Q.      And then as you -- are you starting to go to
3    the scene when you hear that?
4    A.      Initially?
5    Q.      Uh-huh.
6    A.      Did I start going to the scene initially?
7    Q.      Uh-huh.
8    A.      When I heard the hit and run, no, I did not
9    initially go to the scene.
10   Q.      Okay.  It just sounded like somebody -- some
11   property damage where somebody hit something and left
12   the scene, right?
13                  MR. JONES:  Object to the form.
14                  MR. SEWARD:  You can answer.
15   A.      As a hit and run, yeah.  Like somebody hit
16   something, a car, property --
17   BY MR. SEWARD:
18   Q.      Yeah.
19   A.      -- you know, and left the scene.
20   Q.      Yeah.  There was no report of from nine -- or
21   from the dispatcher or from anybody else that some
22   violent crime had committed, that someone was
23   seriously injured or anything.  You didn't hear
24   anything like that, did you?
25                  MR. JONES:  Object to the form.
```

```
1    A.      And --

2    BY MR. SEWARD:

3    Q.      Prior to the other calls coming in.

4    A.      Prior to -- my first initial -- what I first

5    initially heard was hit and run.

6    Q.      Okay.  And so that doesn't sound like an

7    emergency, so you didn't go to render aid, right?

8    A.      (No verbal response.)

9    Q.      You can answer that.

10   A.      At the time, it -- when the first initial

11   call came out as a hit and run, that's all I heard at

12   that time.

13   Q.      Right.

14   A.      So I wasn't sure of -- I wasn't sure what was

15   going on.  That's why I continued to listen to the

16   radio.

17   Q.      Okay.  And after some period of time, some

18   minutes, right?

19   A.      I can't say it was minutes.  I cannot say

20   that.  No.

21   Q.      Was it around the middle of the day when this

22   happened?  12 o'clock or 1 o'clock, somewhere in that

23   time frame?

24   A.      I can't remember the time frame.  I just know

25   it was sunny outside.
```

1   Q.      Okay.

2   A.      So I mean, it's -- in Memphis, I mean, the

3   sun is out during the summer until 7 o'clock.  So I

4   can't remember the exact time right now.

5   Q.      Okay.  Can we agree that when you arrived on

6   Big Orange Road, it wasn't raining, the weather -- it

7   was clear outside, right?

8   A.      Yes, sir.

9   Q.      The sun was shining?

10  A.      Yes, sir.

11  Q.      Okay.  It was a clear Memphis day in July,

12  right?

13  A.      Nice, hot Memphis day in July.

14  Q.      Probably hot too, right?

15  A.      Yes, sir.

16  Q.      All right.  But on the way over there to the

17  scene, you learned further information that there's

18  an individual walking down Big Orange Road, right?

19              MR. JONES:  Object to the form.

20              MR. SEWARD:  This is cross-exam -- well,

21  he's an adverse witness regardless.  And you can

22  tender your objection.  We'll take it up with the

23  Court.

24  A.      All right.  What are you saying?  Can you

25  repeat your question?

| 1 | following the suspect later identified as Eddie |
| 2 | Studdard or Edmond Studdard, Deputy Lane was heading |
| 3 | northbound following him on Big Orange Road, correct? |
| 4 | A. Yes, sir. |
| 5 | Q. All right. At some point, you got on Big |
| 6 | Orange Road driving in your -- is it a Taurus? Is |
| 7 | that what you said or a? |
| 8 | A. No. I said a Fusion. |
| 9 | Q. A Fusion, right? Ford Fusion? |
| 10 | A. Yes. |
| 11 | Q. So at some point, you were driving a car on |
| 12 | Big Orange Road while you had Deputy Lane in sight, |
| 13 | right? |
| 14 | A. Was he in sight? Yes, he was in sight. |
| 15 | Q. Okay. So when you -- were you going the same |
| 16 | direction as Deputy Lane at that time, or were you |
| 17 | following from behind and you overtook him and passed |
| 18 | him? |
| 19 | A. No. I can't remember. I don't know if I |
| 20 | beat him to the street before he got to the |
| 21 | intersection. I'm not -- I can't remember at that |
| 22 | time. |
| 23 | Q. I'm not asking who got there first. And I'm |
| 24 | not trying to -- |
| 25 | A. What I'm saying is -- |

```
 1    A.      No.   Because if this is the -- if this is the
 2    scene, some -- my car is being blocked.
 3    BY MR. SEWARD:
 4    Q.      Okay.  But you think you were -- I'm sorry.
 5    How far from Eddie Studdard or Edmond Studdard?
 6    A.      I would say approximately 10 to 15 feet.
 7    Q.      10 to 15 feet when you parked -- so you
 8    parked -- you pulled almost right up to him?
 9    A.      No.  I didn't pull up -- no.  I did not pull
10    up right to -- I pulled approximately 10 to 15 feet
11    away from him.
12    Q.      Okay.  Well, he was -- was he walking or
13    standing still when you parked?
14    A.      When I parked, he was still walking.
15    Q.      He was still walking.  Okay.
16    A.      Yes.
17    Q.      And as you pulled in -- and I don't know
18    if I'll have to look this up.  We talked about Deputy
19    Abdullah.  You know who I'm talking about when I say
20    that name, don't you?
21    A.      Yeah.  I know who he is.
22    Q.      You know him, right?
23    A.      Yes.
24    Q.      We talked -- if you saw him, you'd recognize
25    him, right?
```

1  A.      Yeah.  If I saw him, I'd recognize him.  Yes,
2  sir.
3  Q.      Okay.  Did you see Deputy Abdullah's
4  automobile or Crown Victoria parked on -- at the
5  intersection of Big Orange Road and Macon?
6  A.      I don't know what Abdullah was riding.  I
7  just -- after the shooting, he appeared.  I don't
8  know what who he was driving in.  I don't know where
9  he came from.
10  Q.      Okay.
11  A.      But at -- on the time of the shooting, and
12  matter of fact, at the time where we were -- at the
13  time of the shooting, I don't know where he was.  He
14  was not on the scene at the time of the shooting.
15  Q.      Okay.  So you never saw him prior to the
16  shooting?
17  A.      Prior to the shooting?
18  Q.      Right.
19  A.      Prior to -- earlier that -- yeah.  Prior, I
20  saw him sometime that day.
21  Q.      Oh, no.  You never saw him on -- at the
22  intersection of Macon and Big Orange Road prior to
23  the shooting?
24  A.      I can't recall seeing Abdullah, no.
25  Q.      Would it surprise you if he said that he was

```
 1    A.      Okay.

 2    Q.      I asked you, prior to -- immediately prior to

 3    the shooting, did you see Edmond Studdard's face, and

 4    could you see it clearly?

 5    A.      Clearly?

 6    Q.      Yes or no.

 7    A.      Yes.

 8    Q.      All right.  And did he have blood on his

 9    face?

10    A.      I can't recall.

11    Q.      Okay.  Had he had blood all over his face,

12    you would have remembered that, wouldn't you?

13    A.      I don't know.  Like I said, it was two years

14    ago.  I can't recall.

15    Q.      Okay.  Again, same question:  Were you close

16    enough to him to see whether he had blood on both his

17    wrists?

18    A.      Like I said earlier, I can't recall what he

19    had on his wrists.

20    Q.      Okay.  And when you saw him, he hadn't

21    committed any violent felony, had he?

22    A.      At the time?  No.  I don't know --

23    Q.      Right.

24    A.      -- what felony he committed at the time

25    because I was not the initial officer on the scene.
```

```
 1   towards --

 2   A.      Basically, we had all -- he couldn't go

 3   anywhere.  That's what I'm telling you.  We had it

 4   blocked to where he could not go anywhere.

 5   Q.      Okay.  Because if he's headed northbound on

 6   Big Orange Road, there's a wooden fence that runs

 7   along that on that --

 8   A.      On his backside.

 9   Q.      -- on the east side.  On the east side,

10   right?

11   A.      On his backside.

12   Q.      Right.  So if Officer Lane's behind him --

13   A.      I'm not saying -- because I don't want to get

14   into this direction thing.  All I'm saying is that he

15   could not go anywhere.  He could not -- he -- Mr. --

16   was it Studdard?  -- Mr. Studdard could not go

17   anywhere at that time.

18   Q.      Okay.  You had him cornered in at some point,

19   right?

20   A.      Cornered, boxed in, yeah.

21   Q.      What's the difference between cornered and

22   boxed?

23   A.      I don't know.  You say cornered.  I say

24   boxed.

25   Q.      All right.  You had him boxed in, right?
```

```
1    A.      Right.

2    Q.      But you're using the back fence line to

3    assist you in boxing him, right?

4    A.      We use his background -- whatever was in his

5    background, we used, where he couldn't go anywhere.

6    I don't know if it was the field of grass or the

7    fence.  I know there was a fence close.  I'm not sure

8    that's exactly where he was in front of.  So I'm not

9    going to say he was right in front of the fence.  We

10   just knew that he -- where he was, he couldn't go

11   anywhere.

12   Q.      Okay.  And when you got there, you parked --

13   you said you -- you testified you pulled up to within

14   15 feet of him, right?

15   A.      No.  I said I pulled up within 10 to 15 feet

16   of him.

17   Q.      Okay.  And did you know what kind of weapon

18   he had supposedly?

19             MR. JONES:  Object to the form.

20   A.      What I saw was a knife.

21   BY MR. SEWARD:

22   Q.      All right.  We're going to get to that.

23   Okay?

24   A.      You just asked me.

25   Q.      Okay.  All right.  But to your information,
```

| | |
|---|---|
| 1 | Q. Well, I thought he was walking north on -- |
| 2 | A. He was. He turned around when we parked. |
| 3 | Q. -- Big Orange? |
| 4 | Like I said, when you pulled up and parked, |
| 5 | and you pulled up about the same time as Pair and |
| 6 | Shepherd, right? |
| 7 | A. Uh-huh. |
| 8 | Q. So y'all pull up. He stops his move -- |
| 9 | forward movement, right? |
| 10 | A. Yes. |
| 11 | Q. Okay. He realized he was boxed in, right? |
| 12 | A. I don't know what he realized. |
| 13 | Q. But he was boxed in, wasn't he? |
| 14 | A. Yes, he was. |
| 15 | Q. Okay. When you got out of your car, was |
| 16 | Shepherd and Pair to your left, or were you all the |
| 17 | way to the left? Where -- |
| 18 | A. No. They were to my left. |
| 19 | Q. So -- all right. Who was the first -- were |
| 20 | they next to each other, or were they apart from each |
| 21 | other? |
| 22 | A. They were next to each other. |
| 23 | Q. Like how many -- like two feet away? |
| 24 | A. I don't know. I can't remember what they |
| 25 | were doing because they -- my focus was on the |

```
1    divides the road?  It was yellow.
2    A.      Yeah.  I was in front of -- I was in front of
3    the hood of my car.
4    Q.      And was your car --
5    A.      And then -- and then I stepped in -- yeah.
6            I was in front of the hood of my car if I
7    recall right.
8    Q.      And, again, the location of your car, was it
9    in the middle of the road, to the right of the center
10   line, to the left of the center line?
11   A.      It was in the street.
12   Q.      It was in the street?
13   A.      Uh-huh.
14   Q.      You don't remember if it was on the right
15   side, the middle side?
16   A.      It depends on which way you were going.
17   Q.      Looking southbound.
18   A.      `It was more -- if I'm looking southbound, my
19   car was in the southbound lane.
20   Q.      Okay.  You -- so you would have been to the
21   right side of the yellow line, the center dividing
22   line, right?
23   A.      I never say -- like I say, it depend on which
24   way you were looking at it.  I was in -- I was in the
25   southbound lane.
```

```
 1   Q.     Okay.  But in the southbound lane, you were
 2   10 to 15 feet from the -- from Edmond Studdard at
 3   that point, right?
 4   A.     When, I parked, yes.  I was 10 to 15 feet
 5   from him.
 6   Q.     Was he in the street or was he in the grassy
 7   area on the east side?
 8   A.     I can't remember.  I just know I was 10 to
 9   15 feet from him.
10   Q.     You don't know if he was in the street, or if
11   he had gotten up next to the wall --
12   A.     I can't remember if he -- I can't remember if
13   he stepped on the street, if he was in the grassy
14   area.  I just know I was 10 to 15 feet from him.
15   Q.     Okay.  And then -- all right.  And what
16   happened then?
17             MR. JONES:  Give me one second.
18   BY MR. SEWARD:
19   Q.     You can go ahead.  I'm listening.  What
20   happened then?
21   A.     At which point?
22   Q.     When you -- you got out of your car.  He
23   stopped walking.
24   A.     Uh-huh.
25   Q.     Was his -- was he facing Officer Lane when
```

```
1    Q.    Okay.  So while he's looking at Lane, he
2    has the knife or --
3    A.    No, no.  You're doing it wrong.
4    Q.    Okay.
5    A.    Across his neck.
6    Q.    Okay.  I'm going to give you a moment to show
7    that.  Okay?
8    A.    Okay.
9    Q.    All right.  I'm going to use an exhibit here
10   in a second.  Okay?
11         So -- and so when he has his neck -- excuse
12   me -- is facing Lane, is he saying anything?  When I
13   say "he," Eddie Studdard, Edmond Studdard.
14   A.    When he had his hands in the air?
15   Q.    Right.
16   A.    When he had his hands in the air -- when I --
17   when he was facing Lane, I heard him say, "Shoot me.
18   Shoot me."
19   Q.    Okay.  And if Erin Shepherd says she don't
20   recall him saying anything, you disagree with that,
21   right?
22   A.    No, I would not disagree.  That means from
23   her -- where she was, she couldn't hear nothing.
24   Q.    And she was next to you?
25   A.    She was next to me.
```

```
 1                  MR. SEWARD:  I'll rephrase.
 2    BY MR. SEWARD:
 3    Q.     At the time you fired your weapon on
 4    July 7th, 2016 --
 5    A.     At the time I fired my weapon, uh-huh.
 6    Q.     -- Deputy Lane was looking at the suspect,
 7    correct?
 8    A.     Was he looking at him?
 9    Q.     Yeah.
10    A.     I can't tell you what Deputy Lane was doing.
11    Q.     Okay.  Well, you were on the south part of
12    Big Orange Road, right?
13    A.     The south lane?
14    Q.     The southbound traffic of Big Orange Road.
15           You were standing there, right?
16    A.     I was close -- around the southbound lane.
17    Q.     Okay.  But you --
18    A.     I mean -- I mean, both the lanes -- there's a
19    two-way.  There's a north and southbound lane.
20    They're close.  So I was -- I was in the area.
21    Q.     All right.  But in front of you, though, is
22    Deputy Lane, pointing his pistol at --
23    A.     Who -- why are you saying he was in front of
24    me?
25    Q.     Well, he wasn't behind you.  Deputy Lane
```

```
1    Q.      I'm just asking you.

2    A.      I'm just saying I knew it might have been

3    sort of closed.  I remember seeing a fence, but...

4    Q.      Okay.  And Edmond Studdard was in the grassy

5    area when you shot him, right?

6    A.      I don't know if he was in the grassy area or

7    the street.

8    Q.      Okay.

9    A.      I know he was around the area.

10   Q.      All right.  And how many times did you fire

11   your weapon?

12   A.      I'm not sure.

13   Q.      You don't know?

14   A.      I'm not sure how many times I fired.  Because

15   initially, I thought it was one.  I think they said

16   I shot three.  I'm not sure.  I just know I fired my

17   weapon until the threat was over.

18   Q.      Okay.  And if there's testimony that when the

19   first shot was fired, Mr. Studdard went to the

20   ground, is that correct or incorrect?

21   A.      If there was testimony that happened?

22   Q.      Well, I'm asking you, if there's a

23   statement -- if a statement has been given that

24   Mr. Studdard went down immediately upon the first

25   shot, would you disagree or agree with that?
```

```
1    A.    I'm not sure.  I don't know if he went down
2    on the first -- or whenever he went down, that's when
3    I stopped shooting my firearm.
4    Q.    Okay.  Well, you were there.  You were the
5    one doing the shooting --
6    A.    Right.
7    Q.    -- did he go down with the first shot?
8    A.    I'm not sure he went down with the first
9    shot.  I know when he went down, I went over and
10   kicked the knife out of his hand.  And I pushed him
11   real carefully because he was still moving.
12   Q.    Okay.  And Deputy Shepherd fired her weapon
13   at the same time or after you?
14   A.    I think it was after mine.
15   Q.    How long after?
16   A.    I'm not sure.
17   Q.    Like a few seconds or?
18   A.    I'm not sure.
19   Q.    Okay.
20   A.    I got tunnel vision and auditory exclusion
21   when I fired.
22   Q.    Okay.  Did she fire more than once?
23   A.    I'm not sure.  You'll have to ask her.
24   Q.    Do you know which knife -- which hand he had
25   his knife or the box cutter in?
```

```
1    form because could you have done it within the
2    parameters of time, et cetera.
3              MR. SEWARD:  Well, the question is a
4    proper question because it is an alternative means to
5    apprehend him.
6    BY MR. SEWARD:
7    Q.    Was that option available, if you recall?
8    A.    I'm not sure.  I mean --
9    Q.    Let me ask you.  Do you know what a TASER is?
10   A.    Do I know what one is?
11   Q.    Yeah.  Do you know what one is?
12   A.    Yeah, I know what one is.
13   Q.    You got a gun in your car.  You got a shotgun
14   in your car.  Do you carry a TASER on that day?
15   A.    Nope.
16   Q.    Do any of the Shelby County sheriff's
17   deputies use TASERs?
18   A.    Not that I know of.  If they do, it's new.
19   Q.    Do you know what a TASER is used for?
20   A.    Probably an alternative means.  I'm not sure.
21   I -- we don't carry them, so I don't -- I couldn't
22   tell you.
23   Q.    Okay.  Do you know if it's an alternative
24   means of apprehending a suspect rather than using
25   deadly force?
```

```
1    A.      We don't have TASERs, so I can't tell you
2    what they were used for.
3    Q.      Shelby County sheriff's department on that
4    day did not have any TASERs?
5    A.      PCRU on that day did not have TASERs.
6    Q.      Well, PCRU works with Shelby County sheriff's
7    department, right?
8    A.      Right.  So -- but I don't know if any other
9    unit carries TASERs.
10   Q.      So you never had any -- on that date, you
11   didn't have any information available to you or
12   training from the Shelby County sheriff's department
13   that discussed the use of TASERs in possible
14   situations?
15   A.      On that date, we never trained with TASERs.
16   You are correct.  We did not -- never train -- we
17   never trained with TASERs up to that date.  No.
18   Q.      Have you ever seen a TASER used?
19   A.      Yes.
20   Q.      What does it do?
21   A.      It kind of shocks the suspect or --
22   Q.      Kind of?
23   A.      -- or whoever.
24   Q.      Okay.
25   A.      I mean, it's a pain tolerance.  So somebody,
```

```
1    you know, if their pain tolerance is high, it might

2    not do anything to them.

3    Q.    Could a TASER have been used on Edmond

4    Studdard that day?

5              MR. JONES:  Object to the form.

6              MR. SEWARD:  You can answer it.

7    A.    Nobody had one.

8    BY MR. SEWARD:

9    Q.    If you had one, could you have used it?

10             MR. JONES:  Object to the form.

11   A.    So you want me to think about if we would

12   have had TASERs?

13   BY MR. SEWARD:

14   Q.    Yeah.

15   A.    Well, I couldn't tell you that because we I

16   never -- we never trained with them.

17   Q.    Never trained with them at all?

18   A.    Not with Shelby County.

19   Q.    Do the Sheriff's department, do they still

20   use nightsticks or billy clubs or any type of baton?

21   A.    Yeah, we use ASP batons.

22   Q.    A what?

23   A.    A ASP baton.

24   Q.    How do you spell that?

25   A.    A-S-P.
```

```
1    shoot to end the threat.
2    Q.    All right.  Okay.  Well, at some point, can
3    we agree, Edmond Studdard went down on the ground,
4    right?
5    A.    Yes, he did go to the ground.
6    Q.    Can we agree you fired your gun one or two
7    times?
8              MR. JONES:  Object to the form.
9    BY MR. SEWARD:
10   Q.    Or more?
11   A.    You'll have to ask TBI.
12   Q.    Can we agree you fired your gun that day at
13   him?
14   A.    Yes, I did fire my gun.
15   Q.    You were aiming at him, right?
16   A.    Yes, sir.
17   Q.    Okay.  Can we agree that Erin Shepherd fired
18   her gun?
19   A.    Well, you'd have to ask -- I mean, she was
20   off with me, so I figured she did fire.
21   Q.    Okay.  To your knowledge, have there been
22   other shootings involving the Shelby County sheriff's
23   department in which the issue of mental incompetence
24   or mental illness by the suspect was an issue?
25   A.    I'm not sure because I didn't even know my
```

```
1    Q.      You don't know what you would have done?  You
2    still may have pulled the trigger?
3    A.      I'm not say -- I can't tell you what I would
4    have done because that's not what was in front of me
5    at that time.
6    Q.      Bear with me one second.
7            I'm going to get you out of here.
8    A.      Oh, I'm not in a hurry.
9                  MR. HANSOM:  Well, I am.
10                 THE WITNESS:  Yeah.  You other guys might
11   be.  Yeah.
12                 MR. JONES:  You're very generous,
13   Detective Reed.  I'm starving.
14                 THE WITNESS:  Yeah, everybody else is.
15   BY MR. SEWARD:
16   Q.      I'm going to ask you, you tell me Lieutenant
17   Robertson took you somewhere?
18   A.      Lieutenant --
19   Q.      Was he like your commanding officer or
20   supervisor on that thing?
21   A.      He was -- yeah, he was my lieutenant.  I also
22   had a sergeant.
23   Q.      Okay.  Was he in the car with you or the SUV,
24   whatever it was, with you?
25   A.      I told you nobody was in the car with me.
```

| | |
|---|---|
| 1 | Q. Except Lieutenant Roberts (sic)? |
| 2 | A. I never told you Lieutenant Robertson was in |
| 3 | the car with me. |
| 4 | Q. I thought you said he took me -- took me |
| 5 | somewhere. |
| 6 | A. No. I told you he took me off the scene. |
| 7 | Q. So he told you just to leave the scene? |
| 8 | A. No. He walked me off the scene. |
| 9 | Q. Okay. I don't understand that. |
| 10 | MR. WHITWELL: I think we're talking |
| 11 | about different time frames here. |
| 12 | THE WITNESS: Oh, okay. |
| 13 | BY MR. SEWARD: |
| 14 | Q. Okay. I think you told me -- and if I'm |
| 15 | incorrect, you guys can help me -- some short period |
| 16 | after the shooting occurred, Lieutenant Robertson -- |
| 17 | Robertson came to the scene and walked you off the |
| 18 | scene? |
| 19 | A. After the shooting occurred. |
| 20 | Q. Right. |
| 21 | A. When Lieutenant Robertson made the scene, he |
| 22 | took me off the scene, yes. |
| 23 | Q. Okay. And am I correct in you told me |
| 24 | Lieutenant Robertson showed up shortly after the |
| 25 | shooting, though? |

```
1    A.      Yeah, it was close.  It was closer than a
2    block away.
3    Q.      Okay.  And you went over there until when?
4    A.      Until they told me I could leave.
5    Q.      Who told you you could leave?
6    A.      Lieutenant Robertson.
7    Q.      Okay.  Did the TBI agent, Charles Baker -- or
8    Baker -- come by and see you over there?
9    A.      Yes.
10   Q.      And he saw you in the parking lot where you
11   were at?
12   A.      Yes.
13   Q.      Did he ask you why you had left the scene?
14   A.      No.
15   Q.      All right.  And so when he talked to you, he
16   asked you to give him a statement, though, didn't he?
17   About what had just happened, right?
18   A.      Yes.
19   Q.      And you declined to give him a statement?
20   A.      Right.
21   Q.      All right.  At some point later, it's my
22   understanding, and Mr. Hansom may have represented
23   you in this, you did give a statement to internal
24   affairs in which that -- which was recorded --
25   A.      Right.
```

```
 1    A.      The cause to use deadly force was him coming
 2    at me with a knife.
 3    BY MR. SEWARD:
 4    Q.      Did you file that with the sheriff's
 5    department?  Were those formal charges that you
 6    filed --
 7    A.      That I filed?
 8    Q.      -- after the shooting?
 9    A.      Did I file charges?
10    Q.      That's right.  That's my question.
11    A.      I didn't file any charges.
12    Q.      Did anybody?
13    A.      I'm not sure.
14    Q.      Why not?
15    A.      You can ask and look at the report.  I'm not
16    sure.
17    Q.      Well, if he was coming at you, trying to kill
18    you, that's attempted murder, isn't it?
19    A.      I'm not sure what they -- what he was charged
20    with or if he was charged.
21    Q.      Minimum aggravated assault, using a serious
22    -- a weapon to cause serious bodily injury, right?
23              MR. JONES:  Object to the form.  That's
24    just a jury argument.  Come on.
25    A.      Yeah.  The answer to that would be on the --
```

```
 1    Q.      Whatever time of day it was, we all agree it
 2    was summer on Big Orange Road, right?
 3    A.      It was a hot -- it was a hot day on Big
 4    Orange Road.  Yes, we do.
 5    Q.      In broad daylight?
 6    A.      Yes.
 7    Q.      We've got four Shelby County sheriff's
 8    deputies all in plain sight of each other, right?
 9    A.      Yes, sir.
10    Q.      Okay.  And then -- but you make a decision to
11    shoot, right?
12    A.      Yes, I did.
13    Q.      Deputy Shepherd made a decision to shoot,
14    right?
15    A.      Yes, she did.
16    Q.      Deputy Pair did not shoot, did he?
17    A.      I'm not sure.  I cannot testify to what Lane,
18    Shepherd, and Pair did.
19    Q.      Okay.  Deputy Kyle Lane had his pistol
20    pointed at Edmond Studdard, didn't he?
21    A.      I cannot testify to what Lane, Shepherd, and
22    Pair did.
23    Q.      Well, can you agree, if Deputy Kyle,
24    immediately prior to the time Eddie -- Edmond
25    Studdard was shot, felt that Edmond Studdard was a
```

```
1   fired their weapons?

2   A.      Would it surprise me?

3   Q.      Uh-huh.  And the other deputies didn't?

4              MR. JONES:  Object to the form.

5   A.      I mean, why would it be a surprise?

6   BY MR. SEWARD:

7   Q.      Because they're trained in dealing with

8   people with mental health issues.

9   A.      Who knew about mental health issues?  Who had

10  a mental health issue?

11  Q.      Okay.  Well, let's assume this.

12  A.      Assume?

13  Q.      If there was blood on Eddie Studdard's face

14  and his arm that was in plain visible sight to all

15  other deputies except for you, any reason you

16  wouldn't see that blood?

17  A.      I can't assume anything.

18  Q.      But you testified you didn't see any blood,

19  right?

20  A.      I said I don't recall.

21  Q.      So there could have been blood on his face,

22  then?

23             MR. JONES:  Object to the form.

24             MR. SEWARD:  He says he doesn't recall.

25  A.      I don't recall.
```

```
 1   BY MR. SEWARD:

 2   Q.    So you're not saying he did or he didn't.

 3   You said you just don't recall.

 4              MR. JONES:  Object to the form.

 5   A.    I don't recall.

 6   BY MR. SEWARD:

 7   Q.    Okay.  The same would be true regarding his

 8   wrists, right?

 9   A.    I don't recall.

10   Q.    And do you know who recovered the box cutter

11   without the blade after the scene?

12              MR. JONES:  Object to the form.

13   A.    I didn't know there was a box cutter on

14   the -- without a blade on the scene.

15   Q.    Okay.

16   A.    So I don't know who could have recovered

17   something that I didn't know was there.

18   Q.    Okay.  But can I ask you a question?

19              When you went to -- you were questioned by

20   the -- I'll call it the internal affairs in Shelby

21   County sheriff's department, right?

22   A.    Oh, I was questioned by IAB?  Yes.

23   Q.    Right afterwards.  You gave a statement,

24   didn't you?

25   A.    Not that day.  Not that day, I didn't.
```